In the Matter of the APPLICATIONS for WATER RIGHTS OF THE UPPER GUNNISON RIVER WATER CONSERVANCY DISTRICT, IN GUNNISON COUNTY.

The BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF ARAPAHOE, Objector–Appellant and Cross–Appellee,

v.

UPPER GUNNISON RIVER WATER CONSERVANCY DISTRICT, Applicant–Appellee and Cross–Appellant,

and

Crystal Creek Homeowners Association, Colorado Water Conservation Board, Uncompahgre Valley Water Users Association, and the United States of America, Objectors–Appellees,

and

Keith Kepler, Division Engineer, Water Division 4, Appellee.

No. 90SA498.

Supreme Court of Colorado, En Banc.

Oct. 19, 1992.

As Modified on Denial of Rehearing Nov. 9, 1992.

Vranesh and Raisch, John R. Henderson, Paul J. Zilis, Boulder, for objector-appellant and cross-appellee.

Williams, Turner & Holmes, P.C., Anthony W. Williams, Grand Junction, for applicant-appellee and cross-appellant.

Brownstein, Hyatt, Farber & Strickland, Charles B. White, Wayne F. Forman, Denver, for objector-appellee Crystal Creek Homeowners Ass'n.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Steven O. Sims, Asst. Atty. Gen., Denver, for objector-appellee Colorado Water Conservation Bd. and Appellee Div. Engineer, Water Div. 4.

Justice KIRSHBAUM delivered the Opinion of the Court.

Objector–Appellant/Cross–Appellee, the Board of County Commissioners of the County of Arapahoe (the Board), and Applicant–Appellee/Cross–Appellant, Upper Gunnison River Water Conservancy District (the District), appeal an order entered by the District Court for Water Division No. 4 (water court) in two consolidated cases, case No. 86CW202 (case No. 202) and case No. 86CW203 (case No. 203).[1] In case No. 202 the water court dismissed an application filed by the District seeking to add fishery and recreational uses to a water right decreed in 1941 and owned by the United States (the 1941 decree). In case No. 203 the water court granted the District a decree for absolute and conditional storage rights for refills of the Taylor Park Reservoir. The Board has appealed the water court's judgment in case No. 203. The District has cross appealed the water court's judgment in case No. 202. We affirm.

I

This litigation arose in the context of ongoing efforts by the United States, the Uncompahgre Valley Water Users Association (the Association), the District and other parties to put to beneficial use water from the Taylor and Gunnison Rivers in western Colorado. The Taylor River flows southwesterly through Gunnison County, Colorado, to the Taylor Park Reservoir, an on-stream reservoir, and then to Almont, where it is joined by the East River and forms the Gunnison River. A gauge for measuring Taylor River flows is located at Almont.

The Gunnison River flows south and west for approximately twenty miles to the Blue Mesa Reservoir, Dam and Power Plant, located in Gunnison County; thence west to the Morrow Point Reservoir, Dam and Power Plant, located in Gunnison and Montrose Counties; and thence west and north past the Crystal Dam and Reservoir, the Gunnison Diversion Dam and the Gunnison Tunnel, all located in Montrose County. The Taylor Park Reservoir was constructed in the late 1930's in connection with a large reclamation program authorized by Congress [2] (the Uncompahgre Project) to facilitate irrigation of approximately 75,000 acres of land located beyond the Gunnison Tunnel, within the drainage basin of the Uncompahgre River, some 100 miles downstream from the reservoir. The Blue Mesa, Morrow Point, and Crystal facilities were constructed during a period of time beginning in the late 1950's and ending in the late 1970's as part of the federally authorized Colorado River Storage Project.[3] These three facilities collectively constitute the Aspinall Unit of the Colorado River Storage Project.[4]

The Gunnison Tunnel diverts water from the Gunnison River through the Uncompahgre River drainage basin and eventually back into the Gunnison River.[5] The Taylor Park Reservoir was designed to provide a

1. This court has direct appellate jurisdiction of water court adjudications. Colo. Const. art. VI, § 2(2); § 13–4–102(1)(d), 6A C.R.S. (1987); C.A.R. 1(a)(2).

2. Act of June 22, 1938, Ch. 577, 52 Stat. 941 (1938); see generally 43 U.S.C. §§ 371–84 (1988).

3. See 43 U.S.C. § 620a–620o (1988).

4. The Aspinall Unit was initially termed the Curecanti Unit of the Colorado River Storage Project.

5. In 1913 the Gunnison Tunnel was decreed an absolute flow right of 1,135 c.f.s., and a conditional decree for 165 c.f.s., for irrigation purposes.

supplemental source of water through the Gunnison Tunnel for the Uncompahgre Project. In 1948, the Association and the United States entered into a contract pursuant to which the Association agreed to repay the costs of the Uncompahgre Project and to operate and maintain the Taylor Park Reservoir.

The 1941 decree contains a priority date of August 3, 1904. It authorizes the United States to use the Taylor Park Reservoir storage water primarily for irrigation purposes.[6] The decreed capacity of the reservoir is 111,260 acre feet, and its active capacity[7] is 106,230 acre feet.

During the 1950's and early 1960's, the Taylor Park Reservoir was administered in a manner that provided supplemental water supplies for the Gunnison Tunnel when the direct flow right of the Gunnison Tunnel was not fully satisfied. For example, after an irrigation season ended, the reservoir would fill to its storage capacity. If shortages occurred in the Gunnison Tunnel during the next irrigation season, water would be released from the reservoir as needed. As a result, the flow of water in the Taylor and Gunnison Rivers below the Taylor Park Reservoir could change abruptly in rate and volume many times during any year, depending on the frequency and amounts of calls for releases of that water. The wide fluctuations in water flow destroyed fish habitats and spawning areas and at times endangered persons seeking to fish, thus severely restricting use of the Taylor and Gunnison Rivers for fishery and other recreational purposes.

The construction of the Aspinall Unit served to stabilize the flow of water in the Taylor and Gunnison Rivers, as intended. However, the project also produced some adverse effects. For example, construction of the Blue Mesa Dam and Reservoir backed water up for nearly twenty-five miles along the course of the Gunnison River, eliminating many miles of prime trout fishing streams.

The District was created in 1959, pursuant to the Colorado Water Conservancy Act for the purposes of conservation of water resources and promotion of the beneficial use of water within its boundaries.[8] The Taylor Park Reservoir, the Taylor and East Rivers and their tributaries, and the Gunnison River from Almont to the Blue Mesa Dam are located within the District's boundaries.

In the late 1960's, resort owners and others interested in expanding fishing and recreational uses along the Taylor River met with representatives of the District to explore possibilities of regulating releases of Taylor Park Reservoir water in a manner that would produce more stable flow of water in the river. After several meetings among the District, the Association, the United States and others, an informal agreement was reached regarding the Association's practices in administering the Taylor Park Reservoir. In essence, the Association agreed to release Taylor Park Reservoir water in ways that would enhance fishing interests along the Taylor River and address power demands and destructive icing occasioned by the filling of the Blue Mesa Reservoir. In 1972, the

6. In 1941, a conditional decree was entered permitting use of the water stored in the Taylor Park Reservoir for irrigational purposes and for other beneficial uses in furtherance of the Uncompahgre Project, including but not restricted to municipal, domestic, stock watering and manufacturing/hydroelectric purposes. In 1942, the decree was made absolute for all such irrigation and non-irrigation purposes except for manufacturing and hydroelectric purposes; the latter two purposes remained subject to the terms of the conditional decree. The conditional decree for non-irrigation uses of the Taylor Park Reservoir was terminated for lack of diligence in 1986, with the exception of 2 c.f.s. per year, not to exceed 4 c.f.s. per year, which was continued for hydroelectric purposes. The wa-

ter court found, as the parties had stipulated, that as of September 18, 1990, the reservoir was decreed for irrigation purposes only, with the sole exception of this small hydroelectric power use, and had no decree for fishery or recreational purposes.

7. Active capacity is the volume of water normally available for release from a reservoir, the amount contained between the maximum level for which the dam is designed and the minimum level below which water will not normally be released. 6 *Waters and Water Rights* 499 (Robert E. Beck ed. 1991).

8. *See* §§ 37–45–101 to –153, 15 C.R.S. (1990).

Association and the United States executed a formal exchange agreement with respect to the Association's administration of the Taylor Park Reservoir. This agreement required the Association to operate the Taylor Park Reservoir in a manner that would achieve stable water flows in the Taylor and Gunnison Rivers between the Taylor Park Reservoir and the Blue Mesa Reservoir.

In the early 1970's, the District sought to strengthen its abilities to enhance and protect fishery and recreational interests within its jurisdiction by acquiring contractual rights with respect to the operation of the Taylor Park Reservoir. Ultimately the United States, the Association, the District, and the Colorado River Water Conservation District executed a contract (the 1975 contract) that superseded the 1972 exchange agreement. The provisions and effect of the 1975 contract are central to the issues presented by the appeal and cross-appeal.

The 1975 contract establishes a mechanism for exchanging stored water in the Taylor Park Reservoir for stored water in the three Aspinall Unit reservoirs. It authorizes the Association to release Taylor Park Reservoir storage water, when requested to do so by the United States or by the District upon approval of the United States, "in such amounts and at such flow rates and for such purposes as are desired by the United States," and requires the United States to "store a like amount of water in the [Aspinall] Unit Reservoirs for the credit of the Association." It also requires the Association to release Taylor Park Reservoir storage water "at rates which will optimize fishery conditions in and below the reservoir area." The contract defines as an "operating goal" the elimination "as much as possible [of] abrupt changes that would adversely affect ... fisheries, fishery studies and recreation uses."

The 1975 contract establishes a system of credits. All releases from the Taylor Park Reservoir in excess of the Associa-tion's water needs are deemed releases requested by the United States. Upon the Association's request, the United States must release Aspinall Unit storage water, and in such circumstance the Association "will hold a like amount of water or credit for water so released in Taylor Park Reservoir until called for by the United States, or by the [District] as is provided herein." The total amount of water stored in the Aspinall Unit reservoirs for the Association's credit, when added to the amount of water stored in the Taylor Park Reservoir for the Association's credit, cannot exceed the 106,230 acre feet capacity of the Taylor Park Reservoir after consideration of storable inflow, storage releases for Association uses, evaporation and other reservoir losses.

The 1975 contract requires the District to pay the Association $2,000 per year for the exercise of the District's rights thereunder. Those rights include the right to apply for a water right, as follows:

> [A]n application for a water right may be made by the [District] on all surplus flows in Taylor River above Taylor Park Reservoir and all water appropriated thereunder shall be used by the [District] in the Upper Gunnison area. Taylor Park Reservoir will be operated in such a manner to assist the [District] in using such water provided all other purposes herein and the original purposes of said reservoir are accommodated.[9]

After 1975, the Association's coordinated administration of the Taylor Park Reservoir and the Aspinall Unit achieved stabilization of flow in the two rivers and eliminated seasonal variations in flow below that reservoir. As a result, the Association's supplemental irrigation requirements have been satisfied, downstream irrigators have been benefitted through easier headgate management and higher river flows, fisheries have been benefitted by the regulation of the flow established within an optimum range for all life stages, landown-

9. The 1975 contract authorizes the District to acquire water from the United States at the Aspinall Unit reservoir and to exchange such water for water stored in Taylor Park Reservoir pursuant to separate agreements between the District and the United States. No such separate agreement had been executed as of the date the applications herein were filed.

ers have been benefitted by reduced flooding concerns, and recreational users have been benefitted from more predictable and usable flows in the rivers. Resultant minimization of reservoir spills has allowed the Colorado Division of Wildlife to regulate temperatures within the Taylor Park Reservoir for the benefit of various fish species in the reservoir.

Use of the storage capacity of the Taylor Park Reservoir has been an essential feature of the Association's implementation of the 1975 contract. The District's applications relied extensively upon the 1975 contract and the Association's administration thereof. The application in case No. 202 sought a decree authorizing the District to use the 1941 decree for fishing and other recreational purposes. In case No. 203, the District sought a storage right of 106,230 acre feet for recreational purposes, including fishery and wildlife purposes. The application requested an absolute decree for 44,760 acre feet and a conditional decree for the remainder, and also sought authorization to use 19,200 acre feet of the 106,230 acre feet for increased irrigation purposes within the District. In both cases the District requested a priority date of August 28, 1975—the date upon which the 1975 contract was executed.

The water court determined that releases at optimum flow rates during various portions of each season served specific beneficial purposes, as follows: from October 16 through March 31, flow rates of 100–150 c.f.s. served spawning and incubation purposes; from April 1 through June 30, releases of 300–500 c.f.s. served hatching and fry emergence purposes; and from July 1 through October 15 releases of 500 c.f.s. served adult habitat and flushing purposes. The water court also determined that the Association's conduct pursuant to the 1975 contract resulted in second fills of the Taylor Park Reservoir in ten of the thirteen years between 1976 and 1988, in an average amount of 19,905 acre feet, and resulted in releases of water for the benefit of downstream irrigators that would not have been possible absent the contract. The water court found specifically that in 1980 13,777 acre feet of Taylor Park Reservoir storage water was diverted and applied to irrigation uses for the benefit of downstream irrigators, and further found that "total development" would utilize the 19,200 acre feet sought by the District in case No. 203.

Since 1975, the formula adopted by the United States to account for exchanges between the Taylor Park Reservoir and the Aspinall Unit credits the Association's account in the Aspinall Unit for all water in excess of 20 c.f.s. as measured at the gauge below the Taylor Park Dam. This water was stored under the 1904 priority date of the 1941 decree. The 20 c.f.s. exception is based upon the assumption that that amount of water represents the minimum bypass of inflows into the Taylor Park Reservoir necessary to maintain a minimum flow in the Taylor River below the reservoir. The water court found that such practice carries out the intent and provisions of the 1975 contract, has a reasonable relationship to the minimum river flows which the Association historically bypassed from storage prior to 1975, protects the interests of downstream junior appropriators as well as of the Association, and ensures maximum utilization of available water supplies.

The District filed its two applications for water rights in the Taylor Park Reservoir in December 1986. Numerous entities and individuals initially filed objections to the applications, including the Board, the Association, the United States, the Crystal Creek Homeowners Association (Crystal Creek), and the Colorado Water Conservation Board (the Water Conservation Board). Prior to trial, which commenced June 25, 1990, the United States, the Association and the Water Conservation Board withdrew their objections.

On April 16, 1990, prior to withdrawing their objections to the District's applications, the United States, the Association and the Water Conservation Board entered into an agreement with the District (the 1990 agreement) that by its terms supplemented, but did not amend, the 1975 contract. The 1990 agreement provides, *inter alia*, that the Association's administration

of the 1975 contract will not be affected by the ultimate outcome of the District's applications for water rights in case No. 202 or case No. 203; that any water belonging to the District in storage in the Taylor Park Reservoir on the year-end administration date shall on that date become the water of the United States; and that the District "shall assign to the United States any decree held by it for the use of a storage of any water in Taylor Park Reservoir within sixty days after such decree becomes final."

At the conclusion of the trial, the water court denied the application in case No. 202 on the ground that the District had no authority to add beneficial uses to the 1941 decree. In case No. 203, the water court granted the District an absolute storage right of 44,700 acre feet and a conditional storage right of 61,530 acre feet for refill of the Taylor Park Reservoir, with a priority date of August 28, 1975, for fishery and wildlife purposes. The decree also authorized the use of 19,200 acre feet of water for irrigation purposes. In granting the application, the water court incorporated several accounting conditions into the decree, including specification of an administration date of November 1. Those conditions are reproduced as Appendix A to this opinion.

The Board appealed the judgment of the water court in case No. 203, asserting that the water court erred in finding that the District had authority to initiate the water right, in adopting an invalid accounting system, and by in fact decreeing an instream water right. The District cross-appealed the judgment of the water court in case No. 202 on the ground that the District was authorized to apply for a change of use of the 1941 decree. The Water Conservation Board has filed a brief in support of the water court's judgment and Crystal Creek has filed a brief supporting the water court's selection of a November 1 administration date.

## II

The Board first contends that the District failed to establish a valid appropria-

tion of water in case No. 203 because the District never stored any water nor had water stored on its behalf in the Taylor Park Reservoir, because the District lacked the requisite intent to appropriate a definite amount of water, and because the District failed to apply any stored water to any beneficial use. We reject these arguments.

### A

■■■ The right of appropriation under the Colorado Constitution includes the right to store water of a natural stream for later application to beneficial use. § 37–87–101(1), 15 C.R.S. (1990); *Fort Lyon Canal Co. v. Amity Mut. Irrigation Co.,* 688 P.2d 1110, 1112 (Colo.1984). An appropriation is "the application of a specified portion of the waters of the state to a beneficial use." § 37–92–103(3)(a), 15 C.R.S. (1990). A beneficial use includes "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made ... [and] includes the impoundment of water for recreational purposes, including fishery or wildlife...." § 37–92–103(4), 15 C.R.S. (1990); *see also Zigan Sand & Gravel v. Cache La Poudre Water Users Ass'n,* 758 P.2d 175, 182 (Colo.1988). Thus an effective appropriation requires diversion of a definite quantity of water with the intent to apply that water to some beneficial use. *Fort Lyon Canal Co.,* 688 P.2d at 1113; *City and County of Denver v. Northern Colorado Water Conservancy Dist.,* 130 Colo. 375, 386, 276 P.2d 992, 998 (1954). While the ultimate determinations of whether the requirements of diversion and intent have been established by an applicant present mixed questions of fact and law, *see City of Thornton v. City of Fort Collins,* 830 P.2d 915, 924–25 (Colo. 1992), they are necessarily fact dependent. A water court's predicate factual determinations will not be disturbed on appeal unless the evidence is wholly insufficient to support those determinations. *People v. City of Thornton,* 775 P.2d 11, 19 (Colo. 1989); *Southeastern Colorado Water Con-*

*servancy Dist. v. Twin Lakes Assoc.*, 770 P.2d 1231, 1239 (Colo.1989).

The water court found that releases of water from the Taylor Park Reservoir and the refill of that reservoir pursuant to the provisions of the 1975 contract "resulted in the second fill of the Taylor Reservoir which is claimed by the [District] in [case No. 203]," and that second fills occurred in the reservoir in ten of the thirteen years between 1976 and 1988. The water court also found that in 1980 13,777 acre feet of storage water was diverted and applied to irrigation uses from the Taylor Park Reservoir.

■ These releases were occasioned by the Association's administration of the 1975 contract, the basic provisions of which assured that the flow of water to and from the Taylor Park Reservoir would be regulated in compliance with the District's goals. While the Association exercised direct physical control over the gates of the reservoir, the District exercised control over those physical operations via the provisions of the contract. In addition, the 1975 contract provided that all water in excess of 20 c.f.s. passing through the Almont gauge would be credited to the Association account in the Aspinall Unit. As a result, additional water—refill water—was stored in the Taylor Park Reservoir for release pursuant to requests by the District and/or the United States. The evidence establishes that such releases in measurable quantities were in fact made in furtherance of the District's goal of enhancing fishery and recreational interests in the Taylor and Gunnison Rivers. This evidence supports the water court's conclusion that the District exercised sufficient control over the refill water it sought to appropriate in case No. 203 to accomplish the proposed beneficial purposes.

**B**

■ The Board asserts that because the District did not have specific knowledge of the dates of any alleged refills and cannot rely upon conduct of others to establish the requisite intent to initiate an appropriation,

the water court erred in approving the District's application. We do not agree.

■ Intent to appropriate requires a fixed purpose to pursue diligently a certain course of action to take and beneficially use water from a particular source. *City and County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 745 (Colo.1985). Intent is primarily a question of fact. *Orr v. City and County of Denver*, 194 Colo. 125, 126, 572 P.2d 805, 805 (1977).

By executing the 1975 contract on August 28, 1975, the District acquired the right to participate in directing the Association's administration of the Taylor Park Reservoir for fishery, recreational and increased irrigation purposes. Minutes of District Board of Directors meetings during which the proposed 1975 contract was discussed, constitute evidence that the District intended to appropriate Taylor Park Reservoir refill storage water for fishery, recreational and increased irrigation purposes prior to August 28, 1975. The record also establishes that numerous public meetings were held prior to August 28, 1975, for the purpose of discussing the proposed 1975 contract, and that an environmental assessment of the proposed 1975 contract prepared by federal officials was circulated prior to the execution of that contract. This evidence amply supports the water court's conclusion that as of August 28, 1975, the District had the requisite intent to put Taylor Park Reservoir refill water to beneficial use.

The Board alternatively contends that, assuming that the District formed the requisite intent to appropriate refill water, the District nevertheless failed to establish that it performed an overt act manifesting that intent. We again disagree.

■ The General Assembly has defined a conditional water right as "a right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6), 15 C.R.S. (1990). A conditional water right is established upon the concurrence of an intent to appropriate wa-

ter and the performance of overt acts in furtherance of that intent. *City of Thornton v. City of Fort Collins*, 830 P.2d 915, 924–25 (Colo.1992); *City of Aspen v. Colorado River Water Conservation Dist.*, 696 P.2d 758, 762–63 (Colo.1985); *City and County of Denver v. Colorado River Water Conservation Dist.*, 696 P.2d 730, 745 (Colo.1985); *Fort Lyon Canal Co. v. Amity Mut. Irrigation Co.*, 688 P.2d 1110, 1114 (Colo.1984); *Lionelle v. Southeastern Colorado Water Conservancy Dist.*, 676 P.2d 1162, 1168 (Colo.1984). The overt act must be sufficient "to manifest the necessary intent, to demonstrate that a substantial step toward the application of water to beneficial use has been taken, and, most importantly, to constitute notice to interested persons of the proposed demand upon the water supply." *City of Aspen*, 696 P.2d at 762–63. The determination of whether this requisite first step has been taken must be made on an ad hoc basis, taking into account the particular facts in each case. *City and County of Denver*, 696 P.2d at 745.

■ The record reveals that the District conducted negotiations from 1972 to 1975 to establish a means of ensuring that Taylor Park Reservoir storage water would be used to enhance fishery, recreational and irrigational purposes within the District. In addition, its execution of the 1975 contract and payment of fees pursuant to that contract constitute specific overt acts sufficient to put third parties on notice of its intent to appropriate Taylor Park Reservoir refill water. Under all the circumstances, this conduct constitutes overt acts by the District demonstrating its intent to appropriate Taylor Park Reservoir refill water.

### C

■ The Board contends that the District failed to establish that it had applied any refill water to beneficial uses because the District lacked the ability to control releases from Taylor Park Reservoir. As we have previously determined, the provisions of the 1975 contract demonstrate the District's control over the application of refill water in the Taylor Park Reservoir to

further fishery and recreational beneficial uses. The contract authorizes the District to request the Association to release refill water from the Taylor Park Reservoir, with the approval of the United States, and to participate in supervising and coordinating exchanges of water between the Aspinall Unit and the Taylor Park Reservoir. It is undisputed that refill water was in fact released from the Taylor Park Reservoir.

The water court determined that the actual operations of the Taylor Park Reservoir pursuant to the 1975 contract resulted in second fills of the reservoir and made water legally available to downstream irrigators that would not have been available in the absence of such contract. The water court also specifically found that in 1980 13,777 acre feet of stored water from the District's claimed refill right in the Taylor Park Reservoir was diverted and applied to irrigation uses within the District by downstream irrigators and that "total development would utilize the entire 19,200 acre feet for which application was made" for irrigation purposes. While the evidence is conflicting with regard to the identification of specific lands and owners of irrigation decrees benefitted by the releases of the 13,777 claimed refill, the evidence as a whole supports the water court's findings that a legal benefit accrued to downstream irrigators. *See Colorado River Water Conservation Dist. v. City and County of Denver*, 642 P.2d 510 (Colo.1982); *Baca Irrigating Ditch Co. v. Model Land and Irrigation Co.*, 80 Colo. 398, 252 P. 358 (1927).

■ The evidence also supports the water court's finding that these releases resulted in the following specific benefits, with no injury to any downstream junior appropriators: easing headgate management by downstream irrigators; aiding fisheries by avoiding disruption of spawn and fry life stages and maintaining constant flows within an optimum range for all life stages; reducing flooding to the benefit of landowners; enhancing recreational uses by providing more predictable river and boating flows; and minimizing

reservoir spills. The fact that the Association rather than the District exercised direct operational control over releases of water from the Taylor Park Reservoir is inconsequential, in view of the fact that the 1975 contract granted the District significant authority to ensure that those releases were made for fishery and other recreational uses. Under these circumstances, the District satisfied its burden of establishing that the refill water it sought to appropriate had been and would be put to the beneficial uses sought by its application.

### III

■ The Board next argues that the 1975 contract did not authorize the District to file the application in case No. 203 for a storage right to refill the Taylor Park Reservoir. We disagree.

The 1975 contract contains the following pertinent language:

> The parties hereto agree that an application for a water right may be made by the [District] on all surplus flows in Taylor River above Taylor Park Reservoir and all water appropriated thereunder shall be used by the [District] in the Upper Gunnison area. Taylor Park Reservoir will be operated in such a manner to assist the [District] in using such water provided all other purposes herein and the original purposes of said reservoir are accommodated.

This provision reflects the agreement of all parties to the 1975 contract, including the United States and the Association, that the District could independently appropriate water in surplus Taylor River flows above the Taylor Park Reservoir and that the reservoir would be operated in a manner that would assist the District in putting any water so appropriated to beneficial use. Although the United States initially opposed the District's application on the ground that the District was not authorized to use the Taylor Park Reservoir for pur-

poses other than irrigation use, the United States ultimately withdrew its opposition to the application.

■ When the provisions of a contract are ambiguous, parol evidence is admissible to clarify the intent of the parties with respect to such provisions. *In re May,* 756 P.2d 362 (Colo.1988); *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo. 1984); *see Horizon Joint Venture v. Horizon Partnership, Ltd.,* 791 P.2d 1223 (Colo. App.1990). At trial, both the Association and the Board called witnesses to testify concerning the scope of authority granted by the United States to the District by the 1975 contract with respect to the District's use of the Taylor Park Reservoir. Depositions of various federal officials and the minutes of a 1974 meeting of the District's Board of Directors were also introduced to clarify the intent of the parties to the 1975 contract with respect to the District's authority to appropriate Taylor Park Reservoir refill water for its own uses. During the course of the 1974 meeting of the District's Board of Directors John E. Kreidler, then general counsel for the Association, stated that the proposed 1975 contract would permit the District to "utilize Taylor Reservoir, when the Association is not utilizing the full storage capacity, to store [the District's] water therein."[10] The record also contains evidence that some employees of the United States Bureau of Reclamation were of the opinion that the 1975 contract granted the District the right to add additional uses of water in the Taylor Park Reservoir. While the record also establishes that some Association representatives and some federal government employees were of the opinion that the 1975 contract did not authorize the District to refill the Taylor Park Reservoir, the water court's contrary conclusion is not only supported by the record but is reasonable in view of the purposes expressed by the contract itself. In the absence of an ability to use the Taylor Park Reservoir to store water appropriated for fishery and other

---

**10.** At trial, Kreidler opined that the District had no authority under the terms of the 1975 contract to direct the Association's management of the Taylor Park Reservoir. On cross-examina-

tion, however, he did not deny making the statement attributed to him in the minutes of the 1974 meeting of the District's Board of Directors.

recreational uses, the District's professed right to appropriate water for such uses along the Taylor River below the reservoir would be rendered meaningless. In our view, the record fully supports the water court's conclusion that the 1975 contract authorized the District to apply for a right to refill the Taylor Park Reservoir to its capacity for storage of Taylor River Water for fishery, recreational and irrigational uses.[11]

## IV

The Board argues that the accounting system relied upon by the District to establish the existence and magnitude of its claimed water right and adopted by the water court as a condition of the decree is defective. The Board argues that the system improperly adopts a November 1 administration date and improperly credits water passing directly through the Taylor Park Reservoir as water being stored.[12] We reject these arguments.

The accounting system approved and adopted by the water court is based primarily upon a report prepared by D.D. Helton of Tipton and Kalmbach, Inc. (the Helton Report) in 1990 at the request of the District. The Helton Report estimated the amount of refill that actually occurred in the Taylor Park Reservoir from 1976 through 1988 and the amount of water actually diverted to ditches in the District during that time that could not have been so diverted in the absence of the manage-

ment principles established by the 1975 contract. The Helton Report concluded that refills and beneficial releases in fact occurred from 1976 to 1988.

## A

■ The Board contends that the accounting system adopted by the water court is flawed insofar as it adopts an administration date of November 1. Although the Board concedes that a November 1 administration date may be appropriate for measuring releases in typical irrigation reservoirs, it argues that the evidence established that the Taylor Park Reservoir has since 1975 been administered as a multi-purpose reservoir. The Board contends that the date upon which the low point of storage occurs in each year should be adopted as the administration date for that year, in conformance with the general practice associated with the administration of multi-purpose reservoirs.[13] We disagree.

A reservoir is permitted one filling each year; and a storage right is entitled to claim whatever water is available each year to fill that storage decree. *City of Westminster v. Church*, 167 Colo. 1, 14, 445 P.2d 52, 58 (1968); *Holbrook Dist. v. Fort Lyon Canal Co.*, 84 Colo. 174, 192, 269 P. 574, 582 (1928). Consequently, some date must be selected to fix the time at which the contents of a reservoir will be charged against the next annual fill.

**11.** On April 16, 1990, the United States and the District executed an agreement requiring the District to assign to the United States any water rights acquired by the District in case No. 202 or case No. 203. Consideration of that agreement is unnecessary in view of our affirmance of the water court's conclusion that the 1975 contract itself authorized the District to file the application for storage right in case No. 203.

**12.** The Board also asserts that the District's application for a conditional storage right in case No. 203 is improperly based upon an undecreed change of water right due to a change of place of storage of the 1941 right from the Taylor Park Reservoir to the Blue Mesa Reservoir. *See* § 37–92–103(5), 15 C.R.S. (1990). While the Board advanced this argument in a motion for summary judgment filed and denied in case No. 202, the Board did not address this issue in its

trial brief or in a proposed judgment and decree submitted to the water court in this case. Because neither the District nor the water court had occasion to consider this issue at trial, we will not do so on appeal. *Witcher v. Canon City*, 716 P.2d 445 (Colo.1986); *Christensen v. Hoover*, 643 P.2d 525 (Colo.1982). It is noteworthy that, according to the parties, an exchange application affecting the 1941 decree has been filed by the United States with the water court.

**13.** Adoption of a low point administration date requires selection each year of the date upon which the least amount of water is in place in the reservoir as the point at which to begin calculations of available storage space. Such an administration date will by necessity vary year to year and can result in administration years consisting of more or less than 12 months.

At trial the expert witness agreed that a November 1 administration date is commonly used by Colorado Division Engineers for irrigation reservoirs because the normal irrigation season ends at that time of year. An expert witness called by the District, M.R. Gross, opined that a November 1 administration date was appropriate in this case in view of the Association's historical administration of the Taylor Park Reservoir pursuant to the 1975 contract. D.D. Helton testified that the Colorado State Engineer adopts November 1 as the administration date for most reservoirs because it coincides with the operation of irrigation facilities and that adoption of a low point administration date would be inappropriate for the Taylor Park Reservoir. However, the record also contains evidence that the Colorado Division Engineer utilized low point administration dates in accounting for storage capacities of the Aspinall Unit and other multi-purpose reservoirs.

The water court concluded that adoption of a low point administration date, which date would vary from year to year, would not adequately protect junior downstream water users from potential expansions of the right to refill the Taylor Park Reservoir in particular years. During a low point administration date the storage fill can be expanded by allowing the reservoir to take additional storage after the first fill has occurred but prior to the end of a twelve-month cycle. Hence, downstream junior water users who were entitled to the entire inflow into the reservoir after the first fill would be injured. It also concluded that the November 1 administration date properly reflected the effect of the change in reservoir operations resulting from the coordinated management of the Taylor Park and Blue Mesa Reservoirs pursuant to the 1975 contract. It finally observed that, based on the evidence adduced at trial, a second filling of the Taylor Park Reservoir would occur even if an administration date of January 1 or April 1 were selected.

The record supports the water court's conclusion. While the 1975 contract is designed in part to ensure that releases of water from the Taylor Park Reservoir enhance fishery and other recreational programs downstream and to authorize the District to use the reservoir for such purposes, the contract also emphasizes the fact that those purposes are supplemental to the primary goal of administering the Taylor Park Reservoir to ensure the availability of irrigation water for the Uncompahgre Project. Furthermore, the 1975 contract is designed in part to create stable and predictable flows in the Taylor and Gunnison Rivers. Adoption of a variable low point administration date, as argued by the Board, would not further those important policies of the 1975 contract. Under all the circumstances, the water court did not abuse its discretion in selecting November 1 as the administration date for the storage right decreed in case No. 203.

**B**

The Board also asserts that the accounting system adopted by the water court improperly minimizes storage under the 1941 water right while maximizing the District's refill right.[14] We disagree.

■ Natural stream water may be appropriated for future beneficial use. § 37–87–101(1), 15 C.R.S. (1990). Such storage rights are distinct from direct flow rights that contemplate immediate use of available natural stream water. *Handy Ditch Co. v. Greeley & L. Co.*, 86 Colo. 197, 199, 280 P. 481, 481 (1929). The accounting system approved by the water court recognizes that the District is seeking a storage right rather than a direct flow right.

■ The accounting system includes provisions that all inflow into the Taylor Park Reservoir available under the 1941 decree shall initially be charged against the first fill of the reservoir and that only subsequent fills shall be charged against the District's refill water right. Thus the District is not entitled to credit for storage

**14.** Though not raised by the District, there is some question about the Board's standing to assert this issue. The Board has demonstrated no injury, and the United States has not asserted that its 1941 water right has been jeopardized by the water court's accounting system.

water until the storage right under the 1941 decree has been satisfied.

 In the great majority of the years subsequent to 1975, second fills occurred in the Taylor Park Reservoir. In addition, the Association has often released water unilaterally or upon the joint request of the United States and the District to control the rate of flow in the Taylor River. The water court's determination to credit pass-through water to the first fill reflects the multiple purposes served by the 1975 contract and the salutary practical effects of the operation of the Taylor Park Reservoir under that contract.[15]

The water court's conclusion is also supported by additional evidence adduced at trial. M.R. Gross testified that although reports prepared by the United States for the Almont gauge station did not expressly label storage water as refill water, the reports did reflect the fact that refills actually occurred in the Taylor Park Reservoir. Gross explained that the amount of water attributed to a refill was calculated pursuant to acceptable accounting methods by determining the previous end-of-month storage, subtracting that amount of water from the total storage available less releases, and attributing any water over the first fill capacity to the refill. The method approved by Gross recognized, as did the water court, that actual releases are appropriately charged against the 1941 storage right for purposes of calculating the amount of water available under that right at any given time. The fact that this approach may be characterized as favorable to the District is not controlling. We find no abuse of discretion in the water court's determination to credit by-pass flows to the 1941 right.[16]

V

The Board asserts that the water court's decision to credit pass through water as storage impermissibly grants an instream flow right to the District. We disagree.

The right to appropriate minimum instream flows is governed by section 37–92–102(3), 15 C.R.S. (1990). That statute states in pertinent part as follows:

> [T]he Colorado water conservation board is hereby vested with the exclusive authority ... to appropriate ... such waters of natural streams and lakes as the board determines may be required for minimum stream flows or for natural surface water levels or volumes for natural lakes to preserve the natural environment to a reasonable degree. In the adjudication of water rights pursuant to this article and other applicable law, no other person or entity shall be granted a decree adjudicating a right to water or interests in water for instream flows in a stream channel between specific points, or for natural surface water levels or volumes for natural lakes, for any purpose whatsoever....

§ 37–92–102(3), 15 C.R.S. (1990). The statute grants the Water Conservation Board exclusive authority to appropriate or acquire water for instream uses. *City of*

---

**15.** The Board argues that the accounting system approved by the water court permits a depletion of storage water for irrigation purposes in the Taylor Park Reservoir. The 1975 contract authorizes the District to use its refill storage water only to the extent that "the original purposes of said reservoir are accommodated." This provision alone indicates that the accounting system will not result in injury to holders of water rights who are junior to the 1941 decree. No evidence of any actual or potential injury to the Board was presented at trial, and the evidence that was introduced supports the water court's determination that the Association's administration of the Taylor Park Reservoir pursuant to the 1975 contract benefitted junior water right holders.

**16.** The Board asserts that the District should be denied any refill right because in our recent case of *City and County of Denver v. City of Englewood*, 826 P.2d 1266 (Colo.1992), we concluded that Denver failed to adopt adequate accounting procedures to support its application for an exchange of water rights. In this case, the water court determined that the records maintained by the Association in its administration of the Taylor Park Reservoir pursuant to the 1975 contract are adequate to establish the District's right to a decree. The record supports that determination.

*Thornton v. City of Fort Collins*, 830 P.2d 915 (Colo.1992).[17]

■■■ We observed in *City of Thornton* that the statutory authority of the Water Conservation Board to appropriate minimum instream flow rights is limited to water "in a stream channel between specific points, or for natural surface water levels or volumes for natural lakes." *Id.* at 930. We also observed that the right to appropriate water for ultimate beneficial use by diversion or control guaranteed by article XVI, section 6, of the Colorado Constitution is distinct from and does not conflict with the statutory right of the Water Conservation Board to appropriate minimum instream flow rights. *Id. See Board of County Comm'rs v. Collard*, 827 P.2d 546, 548 n. 4 (Colo.1992).

■■■ The water court concluded that the District's conduct in diverting to storage the water here in question was conduct of general appropriation and did not constitute an effort to establish an instream flow right. The evidence supports the water court's findings that since 1975, pursuant to provisions of the 1975 contract, the District has controlled Taylor River water by ensuring that such water is stored and subsequently released from storage to accomplish the beneficial uses authorized by the 1975 contract. The beneficial use of the appropriated water is thus effectuated by means of a structure—the Taylor Park Reservoir. *See* § 37–92–103(10.5), 15 C.R.S. (1990) (storage means the impoundment, possession and control of water by means of a dam). *See also City of Thornton*, 830 P.2d at 930.

■■■ Furthermore, the minimum instream flow rights decreed to the Water Conservation Board are distinct from the storage right sought by the District. The decreed rights of the Water Conservation Board are sufficient only to protect fish species for short periods of time. The water right sought by the District will be used to enhance fishery and other recreational uses to a substantial degree throughout the year. These distinctions constitute further support for the water court's conclusion that the District's application did not constitute an impermissible application for an instream flow right.

VI

The Board finally asserts that the United States lacks authority to use the Taylor Park Reservoir primarily for fishery and recreational uses and, therefore, that the 1990 agreement between the District and the United States providing that the District shall assign to the United States any water rights decreed to the District in case No. 203 is unauthorized because it is contrary to the purposes and provisions of the Reclamation Act of 1902, 43 U.S.C. §§ 372–448 (1988), establishing the Taylor Park Reservoir as an irrigation facility. Because this issue was not presented to the water court, it will not be considered on appeal. *See Christensen v. Hoover*, 643 P.2d 525, 531 (Colo.1982); *Hercules v. Smith*, 138 Colo. 458, 461, 335 P.2d 255, 256 (1959).[18]

VII

■■■ On cross-appeal the District argues that the water court erroneously denied its

---

17. In August 1988, the water court decreed to the Water Conservation Board instream flow rights for 100 c.f.s. in the summer and 50 c.f.s. in the winter for the Taylor River commencing at the dam outlet of Taylor Park Reservoir to the confluence of Taylor River with Spring Creek. In addition, the Water Conservation Board was decreed in case No. 87CW264 a flow of 200 c.f.s. in the summer and 80 c.f.s. in the winter for the Taylor River commencing at the confluence of Taylor River and Spring Creek and ending at the confluence of Taylor River and East River.

18. The Board contends that it was precluded from raising this issue at trial because the Unit-

ed States did not execute the agreement until April 16, 1990, subsequent to the date upon which the pretrial order delineating the relevant issues was entered. The Board also claims that because at trial the United States did not call any of the witnesses it had listed as potential witnesses, the Board was limited to reliance on deposition testimony of some of those witnesses and was thereby precluded from presenting pertinent evidence. However, the Board had opportunity subsequent to April 16, 1990, to request an amendment of the pretrial order, to issue subpoenas for witnesses, and to take other steps to present this argument to the water court. It did not do so.

application in case No. 202. The District's application sought to add beneficial uses of fishery and other recreational uses to the 1941 decree issued to the United States. The 1941 decree was limited to irrigation and hydroelectric uses. The water court concluded, contrary to the District's arguments, that the District had no authority to acquire additional beneficial uses for the 1941 decree. We agree with the water court's determination.

■ The District's application in case No. 202 requested the water court to change the 1941 water right by increasing the beneficial uses to which the water could be applied. Section 37–92–302 establishes procedural requirements for persons seeking decreed water rights. That statute provides in pertinent part as follows:

> **Applications for water rights or changes of such rights—plans for augmentation.**
>
> (1)(a) Any person who desires a determination of a water right or a conditional water right and the amount and priority thereof, including ... a determination with respect to a change of a water right ... shall file with the water clerk in quadruplicate a verified application setting forth facts supporting the ruling sought, a copy of which shall be sent by the water clerk to the state engineer and the division engineer....

§ 37–92–302(1)(a), 15 C.R.S. (1990). The statute does not by its terms indicate that only owners of decrees of water rights are authorized to seek determinations with respect to changes of water rights.[19] However, we conclude that only the owner of a decreed water right has the requisite legal interest in such decree to obtain a change in the water right subject to the terms thereof. A contrary view would severely undermine the rights and obligations acquired by persons granted decrees as the result of water adjudication proceedings.

■ The District asserts that by executing the 1975 contract the United States in effect granted such authority to the Dis-

trict with respect to the 1941 decree. We disagree.

The 1975 contract establishes a system for managing the 1941 right owned by the United States in a manner to assist the development of fishery and recreational activities along the Taylor and Gunnison Rivers. The contract authorizes the District to apply for "a water right"—not a change of water right. The application is to be made for surplus flows only. Furthermore, any water right obtained by the District must be utilized in a manner that does not impair the ability of the United States and the Association to satisfy the irrigation and hydroelectric uses permitted by the 1941 decree. These portions of the contract support the conclusion that the United States did not grant the District any right to alter the 1941 decree, but rather agreed not to oppose any effort by the District to appropriate undecreed water so long as the use of such appropriated water did not interfere with the ability of the United States to use the water as authorized by the 1941 decree.

■ The District argues that an agreement entered into in 1990 between the District and the United States supports the District's argument that the 1975 contract implicitly granted the District the right to apply for a change to add beneficial uses to the 1941 decree. The 1990 agreement provides that the District "shall assign to the United States any decree held by it for the use of or storage of any water in Taylor Park Reservoir within sixty days after such decree becomes final." Whatever the legal effect of this language, it does not constitute an express or implied authorization by the United States to the District to file an application to add beneficial uses to the 1941 decree.

The District argues that in view of the fact that the 1975 contract authorizes it to store and use water for recreational and fishery uses to benefit the public, the District has inherent authority to protect those

---

19. In *Stancato v. Friend*, 146 Colo. 488, 491, 362 P.2d 400, 401 (1961), we noted that 1953 C.R.S. § 147–9–22 expressly limited the right to obtain a change in the point of diversion of a decreed water right to an owner of such decree.

contract rights and further the public good by all available legal means, including application for a change in the 1941 water right. The District relies upon our decision in *City and County of Denver v. Northern Colorado Water Conservancy Dist.,* 130 Colo. 375, 276 P.2d 992 (1954), to support this argument.

The District's reliance upon *City and County of Denver* is misplaced. That case arose in the context of efforts by the United States Bureau of Reclamation to construct Green Mountain Reservoir pursuant to specific Congressional authority set forth in Senate Document 80. Senate Document 80 provided, *inter alia,* that the contents of Green Mountain Reservoir would be used for the benefit of multiple users in western Colorado to compensate for waters diverted to eastern Colorado. The United States initiated a water adjudication proceeding for Green Mountain Reservoir, but subsequently withdrew from the proceeding. The Colorado River Water Conservancy District then filed a statement of claim for adjudication of a right to the Green Mountain Reservoir as a beneficiary of Senate Document 80.

We ultimately concluded that the United States could not claim the water rights because it occupied the position of trustee or carrier of those water rights. We also determined that under applicable provisions of the Reclamation Act the water rights were in fact owned by the beneficiaries, who were thus authorized to file an application for a determination of water rights. *City and County of Denver,* 130 Colo. at 415, 276 P.2d at 1013. In that case the beneficiaries did not file an application for a change of an existing water right. In addition, Senate Document 80 constituted congressional approval of a plan to change a water right owned by the United States, as required by 43 U.S.C. § 390b(d).[20] In view of these distinctions, *City and Coun-*

*ty of Denver* does not control the result in this case.

The District also contends that it has an inherent right to protect the interests it acquired pursuant to the 1975 contract by seeking to change the 1941 decree. Whatever independent ability to obtain water rights the District might have, that authority does not include the ability to obtain a change in a water right owned by another person or entity absent a grant of such authority to the District by such person or entity.

The evidence supports the water court's conclusion that the District did not own the 1941 decree and was not authorized by the United States, the owner thereof, to initiate a proceeding to change that water right. The water court therefore properly dismissed the District's application in case No. 202.

### VIII

For the foregoing reasons, we affirm the judgment of the water court.

MULLARKEY, J., concurs in part and dissents in part.

QUINN, J., does not participate.

### APPENDIX A

### SCHEDULE A

(Attachment to Decree in 86–CW–203)

### ACCOUNTING CONDITIONS

1. The administration and accounting of the water storage rights sought by Upper Gunnison River Water Conservancy District in Case No. 86–CW–203 shall be done on the basis of a water year that begins on November 1 and extends through the following October 31.

2. The rates and patterns of release of water from Taylor Park Reservoir shall continue to be made to accomplish fishery

---

20. 43 U.S.C. § 390b(d) provides:
Modifications of a reservoir project heretofore authorized, surveyed, planned, or constructed to include storage as provided in subsection (b) of this section which would seriously affect the purposes for which the pro-ject was authorized, surveyed, planned, or constructed, or which would involve major structural or operational changes shall be made only upon the approval of Congress as now provided by law.
43 U.S.C. § 390b(d) (1988).

and recreational purposes and other purposes of the Storage Exchange Agreement as provided in the August 28, 1975, and April 16, 1990, contracts, it being expressly understood that this provision for the continued release of water attributable to the 1904 irrigation water right in the Taylor Park Reservoir shall be pursuant to the aforementioned contracts, and the continued release of water attributable to the refill right granted to the Upper Gunnison River Water Conservancy District shall be pursuant to the terms of this Court's decree in Case No. 86–CW–203.

3. Water in storage in Taylor Park Reservoir and accumulated credits in Blue Mesa Reservoir at the end of any water year shall be charged against the one annual fill of the UVWUA water storage right in the next water year.

4. The first water flowing into Taylor Park Reservoir during the water year, which water is available under the priority of the UVWUA water storage right, shall be charged against the one annual filling of the UVWUA water storage up to the extent of the one annual filling.

5. The next water flowing into Taylor Park Reservoir during the water year, which water is available under the priority of the Upper Gunnison River Water Conservancy District water storage right sought and approved in Case No. 86–CW–203 for the refilling of Taylor Park Reservoir, shall be charged against the one annual filling of said Gunnison District water storage right up to the extent of the one annual filling.

6. Outflows that occur from Taylor Park Reservoir that exceed patterns set forth in paragraph 22 of the Decree shall not be considered as a release from water stored under either UVWUA or Gunnison District water storage rights.

7. Releases that are made from the Taylor Park Reservoir shall be charged first against the water stored under the UVWUA water storage right and shall be considered as having been used pursuant to UVWUA's obligations, and the Gunnison District's rights, under the 1975 Agreement. Such releases shall establish credits in Blue Mesa Reservoir pursuant to the above-mentioned contracts. In the event that such releases exceed the water stored under the UVWUA water storage right in Taylor Park Reservoir, the deficiency shall be charged against the water stored under the Gunnison District water storage right under Case No. 86–CW–203. Any water belonging to the Gunnison District which is in storage on October 31 shall on that date become part of the UVWUA water storage right in accordance with paragraph 5 of the April 16, 1990 Contract.

8. Water delivered to and diverted into the Gunnison Tunnel from UVWUA storage supplies shall be first charged against the UVWUA credit water in Blue Mesa Reservoir.

9. When additional water supplies are needed by the Gunnison District for irrigation purposes and when such water is available from Taylor Park Reservoir under the water right in Case No. 86–CW–203, releases of such supplies shall be made. These releases will be charged against the water stored under the Gunnison District water storage right in paragraph 5, above, and shall be limited to not more than 19,200 acre feet of water in any one water year.

10. The accounting of the UVUWA [sic] exchange shall continue to be made consistent with present procedures except as amended and supplemented herein.

11. If, and when, the Division Engineer determines that it is necessary to charge evaporation against the reservoirs in the Gunnison River Basin, the accounting conditions herein shall be modified appropriately to accommodate such evaporation charges by the Gunnison District and Division Engineer for Water Division No. 4.

Justice MULLARKEY concurring in part and dissenting in part:

I concur in parts I–VI of the majority's opinion, affirming the water court's decision in case No. 203. I respectfully dissent from part VII of the opinion which affirms the water court's decision in case No. 202 and rejects the attempt of the Upper Gunnison River Water Conservancy District

(the "District") to add fishery and recreational uses to the decreed water rights. I conclude that the District does have authority to apply for a change in a water right, even though the right is owned by the United States in trust for the Uncompahgre Valley Water Users Association (the "Association").

## I.

First, it is apparent that the proposed uses are consistent with the terms of the decree. The 1941 decree gave the United States the rights to 106,230 acre feet of water, the capacity of the Taylor Park Reservoir, for irrigation purposes "and for beneficial purposes other than irrigation," including, without restriction, municipal, domestic, stock watering, and manufacturing purposes. Fishery and recreational uses are within the very general uses described in the decree.

Second, the water presently is used for fishery and recreational activities. In 1972, in order to stabilize flows in the Taylor River, and to ensure sufficient water for fishery and recreational purposes, the United States entered into the exchange agreement with the Association. That agreement was superseded by the 1975 contract (the "1975 Agreement"), which included the District as a party. The 1975 Agreement placed the District in a position to enhance and protect fishing and recreation interests because it was authorized to request releases from the reservoir, with the approval of the United States.

Third, the United States through the Bureau of Reclamation has recognized the District's right to seek the proposed uses. At trial, two officials of the Bureau of Reclamation, Frederick Joseph Crabtree, Chief of the Operation and Maintenance Branch, and J. Ronald Johnston, Project Manager of the Projects Office, testified that the District had the authority to appropriate and to add additional uses to the water in the Reservoir under the 1975 Agreement. In addition, Richard Bratton,

the District's attorney, testified that his understanding prior to the onset of the present litigation was that "surplus flows" meant all of the water in the Reservoir, appropriated or not, but subject to the priorities of the Uncompahgre Valley Water Users Association.[1]

Finally, the uses for which the District applied are the same as those for which the United States applied in its Application for Confirmation of Existing Right of Exchange, filed after the 1990 agreement. See maj. op. at 846 for a discussion of the 1990 agreement. There, the United States named both the water rights granted to the District for recreation, fishery, wildlife, and irrigation purposes in case No. 203, as well as water rights which would be deeded over to the United States by the District if this court reversed the Water Court in case No. 202. Thus, the facts of record support the conclusion that the District was authorized to add fishery and recreational uses.

In my view, the majority reads too narrowly the requirements for standing to apply for a change in a water right in concluding that "only the owner of a decreed water right has the requisite legal interest in such decree to obtain a change in the water right subject to the terms thereof." Majority op. at 855. As this case illustrates, interests in water rights are much too complex to be resolved simply by determining which entity has bare legal title to the water rights.

Here, the District has certain indicia of ownership over the water usage at issue. Pursuant to the 1975 Agreement, the approval of the District is required if the United States or the Association wish to sell, lease, or exchange water from the Taylor Park Reservoir. The District's proposed "change" in water right is for a use which was within the 1941 decree as discussed above, and is clearly anticipated by the United States. See 43 U.S.C. § 620g and 16 U.S.C. § 460*l*–18 (both of which authorize the building and maintenance of recreational and wildlife enhancement facil-

---

**1.** Bratton also testified that, after the District had gotten into litigation, his understanding was that "[s]urplus waters means the waters in ex- cess of that above the first filling of the United States under the original Uncompahgre decree."

ities at reclamation reservoirs). Under the facts of this case where the title owner does not object to the added uses and the added uses will be deeded over to the title owner, I see no reason to deny the District's request.

Further, the majority's reliance on bare legal title is inconsistent with our prior cases defining the exercise of water rights. In the context of a mutual ditch company, for example, we have treated the owner of shares in the company as the holder of a water right even though legal title to the water right is held by the company. We have said that the shareholder has the "exclusive use" of a pro-rata share of the water rights held by the company and has the same right to change the water's uses as any other appropriator. *Jacobucci v. District Court,* 189 Colo. 380, 387–88, 541 P.2d 667, 672 (1975). If legal title is dispositive, then this analysis must be wrong. In addition, private agreements can and do modify water rights, and we have given effect to such agreements. *See Fort Lyon Canal Co. v. Catlin Canal Co.,* 642 P.2d 501 (Colo.1982) (enforcing bylaw of mutual ditch company which prohibited shareholder from seeking to change point of diversion without consent of company's board of directors) and cases cited therein. In the present case, a private agreement permits the District to add the water uses which it seeks and we should enforce that agreement.

## II.

The trial court ruled that the District was not entitled to a decree because the added uses did not relate to "surplus flows" within the meaning of the 1975 Agreement. I disagree.

The authority granted to the District to apply for a water right was limited by the 1975 Agreement to "surplus flows" in the Taylor River. The water court concluded that the District had no authority to make the application in case No. 202 because:

> The District's only authority was to make application for a water right which pertained to the *"surplus* flows of the Taylor River above the Taylor Park Res-

ervoir...." The Court concludes that the parties to the 1975 Agreement intended the words "surplus flows" to refer to unappropriated water in the Taylor River. However, the 1904 irrigation decree for the Taylor Park Reservoir by definition identifies previously appropriated water.

(emphasis in original). Thus, the water court equated "surplus flows" with unappropriated water.

This conclusion is contrary to the basic principles of contract construction. The parties to the 1975 Agreement must be presumed to have intended the phrase "surplus flows" to have some meaning with regard to the purposes of the contract. Equating "surplus flows" with unappropriated water gives no new rights or protection to the District. The water court has misread the intent of the parties to the agreement, especially in light of the 1990 Agreement, the United States' Application for Confirmation of Existing Right of Exchange and the other facts discussed above. A more plausible reading of the phrase would be that the District is limited to water uses that do not interfere with the primary purposes of the Uncompahgre Valley and the Colorado Basin Storage Project reclamation projects, i.e., agricultural irrigation use. Here, there is no evidence that fishery and recreation uses which are nonconsumptive have or will interfere with irrigation use. Furthermore, because the District's requested priority date is 1975, compared to the 1941 decree's 1902 priority date, it does not appear that any such conflict is possible. We should remand this issue to the water court to consider the application in case No. 202 on its merits. We should order the water court to quantify the District's proposed water uses, and, if necessary, to condition such uses in order to prevent injury to the holders of more senior water rights.

For these reasons, I respectfully dissent from the majority opinion as to part VII.