**PUBLIC SERVICE COMPANY OF COL-ORADO, d/b/a Xcel Energy, Applicant/Appellant/Cross–Appellee,**

v.

**MEADOW ISLAND DITCH COMPANY NO. 2; Magness Land Holdings, LLC; Magness Platteville, LLC; Kplatteville, LLC; and Dearal Beddo, Opposers/Appellees/Cross–Appellants,**

and

**James HALL, Division Engineer for Water Division No. 1, Appellee.**

No. 05SA52.

Supreme Court of Colorado, En Banc.

April 3, 2006.

Magness Platteville, LLC; Kplatteville, LLC; Dearal Beddo; and the City and County of Denver, and Appellee, Division Engineer for Water Division No. 1, James Hall, cross-appeal the water court's Post–Trial Orders concluding that PSCo's plan for augmentation did not include a contractually-prohibited change in point of diversion. We affirm the water court's order holding that PSCo may not change the use of the excess water under the controlling contracts. We also affirm the water court's judgment approving PSCo's plan for augmentation on the basis that the contracts do not prohibit PSCo from using its decreed water to augment out-of-priority diversions.

## I. Facts and Proceedings

PSCo applied for a change of water rights and approval of a plan for augmentation on July 31, 2002. PSCo's application involves water rights associated with its ownership of 18.5 of the 40 outstanding shares, or 46.25 percent, in the Beeman Ditch and Milling Company ("Beeman"). Beeman's relevant rights, in turn, derive from its interests in Meadow Island's water rights.

As a result, PSCo's relevant water rights derive from its relationship with and between Beeman and Meadow Island. Under a 1905 decree, Meadow Island shares a head-gate with Beeman on the South Platte River, where both divert their respective water rights. Water diverted from the river flows through a shared ditch for approximately 250 feet, where a concrete divider allocates water to Meadow Island and Beeman. Meadow Island owns two water rights that total 66.16 cubic feet per second ("c.f.s."). Its most senior right is Priority No. 12 in the amount of 57.83 c.f.s., with a priority date of May 3, 1866, for irrigation purposes. Meadow Island also owns Priority No. 41 in the amount of 8.33 c.f.s., with a priority date of April 10, 1876, for irrigation purposes.

Meadow Island's decreed water rights are subject to the terms set forth in two 1925 contracts. In 1925, a dispute arose between Meadow Island and Consolidated Ditches Company of District No. 2 ("Consolidated Ditches"), an organization representing numerous irrigation ditches including the Bee-

Ryley Carlock & Applewhite, Brian M. Nazarenus, Carolyn F. Burr, Denver, for Applicant/Appellant/Cross–Appellee Public Service Company of Colorado d/b/a Xcel Energy.

Holland & Hart, LLP, Anne J. Castle, Douglas L. Abbott, Christopher L. Thorne, Denver, Robert E. Schween, P.C., Robert E. Schween, Highlands Ranch, for Opposers/Appellees/Cross–Appellants Meadow Island Ditch Company No. 2; Magness Land Holdings, LLC; Magness Platteville, LLC; Kplatteville, LLC; Dearal Beddo.

No appearance by or on behalf of Appellee James Hall, Division Engineer for Water Division No. 1.

MARTINEZ, Justice.

Applicant–Appellant, Public Service Company of Colorado ("PSCo"), appeals a Pre–Trial Order by the District Court for Water Division No. 1 ("water court"), in which the water court concluded PSCo could not change the use of contractually-delivered water interests without the consent of the appropriative owner, Meadow Island Ditch Company No. 2 ("Meadow Island"). Opposers–Appellees, Meadow Island Ditch Company No. 2; Magness Land Holding LLC;

man Ditch, regarding the distribution of water between Meadow Island and Beeman. On May 18, 1925, Consolidated Ditches, in its individual capacity and on behalf of its members, entered into an agreement to settle the dispute (the "Consolidated/Meadow Island Agreement"). The Consolidated/Meadow Island Agreement limits Meadow Island's draft of water under its decrees to 40 c.f.s. and prohibits changing the point of diversion for Meadow Island water:

NOW, THEREFORE, IN CONSIDERATION OF THE PREMISES and to settle such disputed questions and to avoid litigation between the parties hereto, it is mutually agreed as follows:

1. [Meadow Island] will not, as against [Consolidated Ditches], or by ditches represented by it, *claim or directly or indirectly divert* from said Platte River or from any of its tributaries, either by itself for by, through or at the instance of any of its stockholders or users, *water in excess of forty (40) cubic feet per second,* upon, under or by virtue of all or any of its said decreed priorities for any use or purpose whatsoever, when water is demanded by any of the ditches represented by [Consolidated Ditches] on any of their priorities Junior to priority No. 18, *nor shall any of said forty (40) second feet* of said decreed priorities so diverted by said [Meadow Island] *be used upon any land except such as may be irrigated* by water diverted at said head-gate under the ditches of this time constructed and used, and *it will not draw, or cause to be drawn, water from said river or its tributaries under its said decreed priorities, except at its present head-gate on said river* . . . .

This agreement shall not in any manner or form be construed as authorizing the delivery of water to said [Meadow Island], to the amount of forty (40) cubic feet per second, or any less amount, upon said decrees, except as it may be entitled to draw it from said river under its said priority No. 12, nor to in any way interfere with or abridge Senior priorities to water; *the intention being to limit its maximum draughts from the river under its decreed priorities aforesaid, to forty (40) cubic feet per second,* and to limit its right to call for

water under all priorities decreed to it, to an amount not in excess of forty (40) cubic feet per second as against [Consolidated Ditches] and the priorities Junior to said priority No. 12, of all the ditches it represents.

It is not intended by this agreement that said [Meadow Island] shall, or does hereby abandon to the stream generally any of its water or decreed priorities, or any part thereof, but *is intended to limit its draft of water from the river under and upon its said priorities and the decree to which reference is above made, to said forty (40) cubic feet per second* as against the ditches, and water rights and priorities Junior to said priority No. 12 of the ditches represented by [Consolidated Ditches], and not otherwise.

(Emphasis added.)

In June 1925, Meadow Island and Beeman entered into an agreement and incorporated the terms of the Consolidated/Meadow Island Agreement ("the Beeman/Meadow Island Agreement"). The Beeman/Meadow Island Agreement specifies that Meadow Island will deliver to Beeman water "not required for immediate use" by Meadow Island:

THIS AGREEMENT, made . . . between [MEADOW ISLAND], owner of Meadow Island No. 2 Ditch, party of the first part, and [BEEMAN], party of the second part, both taking water at a common head-gate from the South Platte River in Water District No. 2, WITNESSETH: that

WHEREAS, the said [Meadow Island] 2, entered into agreement on the eighteenth day of May, A.D.1925, with [Consolidated Ditches] of Water District No. 2, all taking water from the South Platte River in Water District No. 2, in order to settle a dispute as to the proper construction and interpretation to be given to a decree issued by the District Court of Weld County, Colorado, on March 29, 1905, *as to the amount of water* which [Meadow Island], should be permitted to divert to its head-gate under said decree and *the place of use thereof* as against Ditches represented by the [Consolidated Ditches], and

WHEREAS, [Meadow Island] was conceded the right to divert from said Platte River or from any of its tributaries, either by itself or by, through or at the instances of any of its stockholders or users, *water not to exceed forty (40) cubic feet per second,* upon, under or by virtue of any or all of its said decreed priorities for any use or purpose whatsoever, when water is demanded by any of the ditches represented by the [Consolidated Ditches] or any of their priorities Junior to priority No. 12, *nor shall any of said forty (40) second feet of said decreed priorities* so diverted by said no. 2 [Meadow Island] *be used upon any land, except such as may be irrigated by water diverted at said head-gate under the ditches at this time constructed and used, and it will not draw, or cause to be drawn, water from said river or its tributaries under its said decreed priorities, except at its present head-gate on said river.*

NOW, THEREFORE, In Consideration of the Promises and the settlement of the disputed questions and to avoid litigation, it is mutually agreed as follows:

Between [Meadow Island] and [Beeman], joint owners in a common head-gate that [Meadow Island] agrees to let the [Beeman] draw, in addition to their one ninth (1/9) interests of the water passing through the joint head-gate, *all the water not required for immediate use by [Meadow Island]* . . . .

(Emphasis added.) The "water not required for immediate use by [Meadow Island]" is referred to as "excess water".[1] When Meadow Island does not require its entire diversion for its own irrigation needs, it diverts the excess water to Beeman until such time as Meadow Island has need of it again.

Together, the Consolidated/Meadow Island and the Beeman/Meadow Island Agreements (collectively, the "1925 Agreements") specify the distribution of Meadow Island water among Meadow Island, Consolidated Ditches and Beeman. The Consolidated/Meadow Is-

land Agreement sets forth the amount of water Meadow Island may divert under its decreed priorities: Meadow Island may not divert water in excess of 40 c.f.s. from the South Platte River. The Beeman/Meadow Island Agreement incorporated the Consolidated/Meadow Island Agreement and settled the distribution of the 40 c.f.s. as between Beeman and Meadow Island: Meadow Island permits Beeman to draw all water not required for Meadow Island's use.

Accordingly, the 1925 Agreements set forth two relevant categories of irrigation rights: the 40 c.f.s. and the excess water. Likewise, Beeman, and therefore PSCo, has an interest in two relevant types of water. First, Beeman owns 12 of the 90 outstanding shares of Meadow Island and is thus entitled to 12/90ths of the 40 c.f.s. water typically diverted under Meadow Island's rights (the "12/90ths water"). Second, Beeman is entitled to Meadow Island's excess water.

PSCo thus has a pro-rata interest in both the excess water and the 12/90ths water. The parties agree in their briefs to this court that PSCo's rights to the excess water are purely contractual and PSCo has no ownership interest in the excess water. Hence, PSCo's interest in the excess water is a contractually-delivered water right. As a result, PSCo's ability to change its pro-rata interest in water diverted under water rights owned by Meadow Island hinges on the terms of these two 1925 Agreements. In contrast, PSCo's pro-rata interest in the 12/90ths water is an adjudicated water right.

Subject to the 1925 Agreements, PSCo sought "to change the place and type of use of the subject water rights," including its pro-rata entitlement to excess water as a Beeman shareholder and its pro-rata shares of Meadow Island's 12/90ths water. PSCo proposed to use the consumptive use credits for all industrial purposes associated with PSCo's Fort St. Vrain Plant, which is located on land that has been historically irrigated. PSCo also sought to use its pro-rata entitlement to excess water and the 12/90ths water

1. The parties refer to the "water not required for immediate use by [Meadow Island]" as "excess water." For convenience, we employ the same terminology. However, by employing the term "excess water," we do not imply that Meadow Island abandoned this water prior to contracting. Nor we do suggest that a contract may appropriately settle an abandonment claim.

under the Beeman/Meadow Island Agreement as a replacement source for the augmentation of out-of-priority diversions and as a substitute supply for a proposed exchange.

In its original application, PSCo sought to change the points of diversion of the subject water rights, including the 12/90ths Meadow Island water, to four new points of diversion for augmentation purposes: the Goosequill Pump Station and Pipeline; the Jay Thomas Pump Station and Pipeline; PSCo Industrial Well No. 10; and PSCo Industrial Well No. 11. PSCo proposed that, in addition to other water rights, its Beeman Ditch water rights and the Meadow Island Ditch water rights would be used to augment otherwise out-of-priority depletions.

Meadow Island objected to PSCo's application on the basis that the terms of the 1925 Agreements prohibited the changes PSCo sought. Prior to trial, PSCo and Meadow Island filed cross motions regarding PSCo's application. First, Meadow Island argued PSCo could not change the point of diversion or type and places of excess water use because PSCo does not own the water rights under which such water is diverted, but merely has the contractual right to receive it. Second, Meadow Island argued unambiguous language in the 1925 Agreements prohibited PSCo's proposed changes in the point of diversion and type and places of use for the 12/90ths water diverted under the Meadow Island water rights.

PSCo argued that, because the 1925 Agreements did not seek to prohibit a change in the use of Meadow Island water, it could change the use of the excess water. PSCo agreed, however, that the 1925 Agreements prohibit a change in the point of diversion for the 12/90ths water. As a result, in its proposed decree, PSCo removed the explicit request to change the point of diversion of PSCo's Beeman shares (including the excess water). Instead, PSCo maintained that all water delivered to PSCo would continue to be diverted through the joint Beeman/Meadow Island head-gate and delivered to PSCo via the Beeman Ditch. Based on these representations, PSCo asked the water court to rule that, provided there was no change in the point of diversion or an expansion of use, PSCo's use of the excess water for non-irrigation purposes was not barred by the 1925 Agreements.

The water court agreed with Meadow Island that the 1925 Agreements were unambiguous and did not provide PSCo with the required consent to change the type of use of the excess water, stating:

(a) The terms of [the May 1925 Consolidated/Meadow Island Agreement and the June 1925 Beeman/Meadow Island Agreement] are *unambiguous;* (b) *Ownership of a water right or consent of the owner of the right is required* in order to change that right; [and] (c) PSCo's rights to use the "excess water" are limited by the terms of the agreements ... Absent the consent of Meadow Island, *PSCo does not have the authority to change the use of the "excess water".*

(Emphasis added.) Consequently, the water court granted Meadow Island's motion on this issue. The water court declined to rule on whether PSCo's plan for augmentation included a contractually-prohibited change in point of diversion for the 12/90ths water.

The remaining issues were tried to the water court in a four-day trial beginning on August 2, 2004. As relevant here, these issues were: (1) whether the May 1925 Consolidated/Meadow Island agreement prohibited PSCo from changing the type of use of its pro-rata interest in the Beeman's 12/90ths Meadow Island water right from irrigation to industrial purposes and (2) whether PSCo's plan for augmentation constituted a change in the point of diversion of its pro rata interest in the Beeman's 12/90ths share of the Meadow Island priorities.

PSCo introduced evidence extrinsic to the 1925 Consolidated/Meadow Island Agreement to demonstrate that PSCo could change the use of the 12/90ths water right. The water court summarized the extrinsic evidence as follows:

Beeman obtained the right to use its shares of Meadow Island water under the Beeman Ditch in the 1905 Decree .... By March 17, 1925, ... Consolidated had become aware of the use of Priority No. 12 water by the Beeman Ditch and was con-

sidering bringing a lawsuit "against the excess appropriation of Meadow Island and an injunction suit enjoining the Beeman Ditch from taking more than its share of water." Negotiations commenced between Consolidated and representatives of the Meadow Island and Beeman Ditches, and on April 14, 1925, the Consolidated Board of Directors entered a resolution stating:

> THEREFORE, BE IT RESOLVED, That we favor entering into a contract with [Meadow Island] whereby said company agrees to limit its diversions of water to forty cubic feet per second on all of its decreed priorities with the understanding that said water shall be drawn only through its present head-gate and used on any land under the ditches from said head-gate.

Subsequently, the Consolidated–Meadow Island Agreement was entered on May 18, 1925, and the Beeman–Meadow Island Agreement was entered during June, 1925.

The water court entered its findings of facts, conclusions of law and decree (the "Decree"), which incorporated the court's Post–Trial Order, on January 3, 2005. As to whether PSCo could change the use of the 12/90ths water, the water court concluded the Consolidated/Meadow Island Agreement was silent concerning a change of use. The water court further concluded the silence on this issue created ambiguity because whether PSCo could change the use of the Meadow Island 12/90ths water was a matter naturally falling within the terms of the agreement. Consequently, the water court considered PSCo's extrinsic evidence, which it found showed that the purpose of the Consolidated/Meadow Island Agreement "was to prevent an expansion of use under the Priority No. 12 water beyond the existing lands irrigated by the Meadow Island and Beeman ditches." The water court found no extrinsic evidence of an intent to limit use of the Meadow Island No. 12 to irrigation purposes. On this basis, the water court concluded PSCo could change the use of its pro rata interest in the 12/90ths water right.

Concerning whether PSCo's proposal constituted a change in the point of diversion of water diverted under Meadow Island's water rights, the water court concluded PSCo's augmentation plan did not include a change in point of diversion prohibited by the 1925 Consolidated/Meadow Island Agreement. Hence, the Decree entered by the water court does not include express approval for a change in point of diversion.

PSCo appeals the water court's Pre–Trial Order prohibiting a change in the type of use of the excess water. Meadow Island and Objector–Appellees cross-appeal the water court's Post–Trial Orders concluding PSCo's plan for augmentation did not include a contractually-prohibited change in the point of diversion.

## II. Analysis

Our task is two-fold. On appeal, we interpret the contractual grant to use Meadow Island's adjudicated water right to determine whether PSCo may change the use of the excess water. On cross-appeal, we consider the contractual restriction on PSCo's adjudicated 12/90ths water right to determine whether PSCo's plan for augmentation violates a prohibition on changing the point of diversion for Meadow Island water.

### A. Appeal

■■■ PSCo argues the water court erred in concluding the Beeman/Meadow Island Agreement was unambiguous and did not grant PSCo the required consent to change the use of the excess water. Whether a written contract is ambiguous is a question of law we review de novo. *Lake Durango Water Co., Inc. v. Pub. Util. Co.*, 67 P.3d 12, 20 (Colo.2003). A contract is ambiguous when it is reasonably susceptible to more than one meaning. *KN Energy, Inc. v. Great W. Sugar Co.*, 698 P.2d 769, 777 (Colo.1985). To decide whether a contract is ambiguous, a court may consider extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract. *Id.* The court may not, however, consider the parties' extrinsic expressions of intent. *Id.* "Silence does not by itself necessarily create ambiguity as a matter of law. Silence does create ambiguity, however,

when it involves a matter naturally within the scope of the contract." *Cheyenne Mtn. Sch. Dist. # 12 v. Thompson,* 861 P.2d 711, 715 (Colo.1993) (citing *Consol. Bearings Co. v. Ehret–Krohn Corp.,* 913 F.2d 1224, 1233 (7th Cir.1990)).

Here, Beeman's entitlement to use the excess water derives from a single provision in the Beeman/Meadow Island Agreement, which provides: "[Meadow Island] agrees to let [Beeman] draw, in addition to their one ninth (1/9) interests of the water passing through the joint head-gate, all the *water not required for immediate use* by [Meadow Island] ..." (emphasis added). The 1925 Agreements do not otherwise reference excess water and do not specify any permissible or prohibited uses of the excess water. Thus, the 1925 Agreements do not expressly grant consumers of the excess water the right to change its use. As a result, we determine whether the absence of language granting a right to change use nevertheless implicitly grants a change in use. On the facts before us, we conclude the Beeman/Meadow Island Agreement provides no such grant and consequently prohibits consumers from changing the use without Meadow Island's consent.

■ A water right is acquired by original appropriation, diversion, and application to beneficial use. *In re Application for Water Rights in Rio Grande County,* 53 P.3d 1165, 1168 (Colo.2002). A decree for an absolute water right identifies the priority and amount of the water right. "Water rights are decreed to structures and points of diversion. Priority, location of diversion at the source of supply, and amount of water for application to beneficial uses are the essential elements of the appropriative water right." *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1148 (Colo.2001) (internal citations omitted); *see also Trail's End Ranch, LLC v. Colo. Div. of Water Res.,* 91 P.3d 1058, 1061 (Colo.2004) (internal citations omitted).

■ A decreed water right is valuable property, not a mere revocable privilege. *Brighton Ditch Co. v. City of Englewood,* 124 Colo. 366, 373–74, 237 P.2d 116, 120 (1951). As a valuable property right, it may be used,

its use changed, and its point of diversion relocated. *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 579, 272 P.2d 629, 631 (1954); *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 316, 618 P.2d 1367, 1371 (1980). "The right to change the use of a vested water right is an important stick in the bundle of rights constituting a Colorado water right." *Farmers Reservoir & Irrigation Co. v. City of Golden,* 44 P.3d 241, 245 (Colo.2002) (citing *Williams v. Midway Prop. Owners Ass'n,* 938 P.2d 515, 523 (Colo.1997)).

■ Colorado law distinguishes between an adjudicated water right and a contractual entitlement to make use of water. *See Green v. Chaffee Ditch Co.,* 150 Colo. 91, 98, 371 P.2d 775, 779 (Colo.1962). The value of an adjudicated water right is such that, absent consent, only the owner of the decreed water right may change it. *Bd. of County Comm'rs of the County of Arapahoe v. Upper Gunnison River Water Conservancy Dist.,* 838 P.2d 840, 855 (Colo.1992) ("[O]nly the owner of a decreed water right has the requisite legal interest in [a water] decree to obtain a change of the water right.") (hereinafter *"Upper Gunnison"*). In this regard, we have emphasized that "[a] contrary view would severely undermine the rights and obligations acquired by persons granted decrees as the result of water adjudication proceedings." *Id.*

■ In contrast, the rights represented by contract are not water rights with a statutory right to change the use. *See Merrick v. Fort Lyon Canal Co.,* 621 P.2d 952, 955 (Colo.1981). Indeed, the authority to obtain water rights under contract "does not include the ability to obtain a change in a water right owned by another person or entity absent a grant of such authority ... by such person or entity." *Upper Gunnison,* 838 P.2d at 855–56. Instead, "[a] contract user is, in effect, a consumer whose rights are determined by the terms of that contract." *City of Thornton v. Bijou Irrigation Co.,* 926 P.2d 1, 60 (Colo.1996) (citing *Chaffee Ditch Co.,* 150 Colo. at 91, 371 P.2d at 779).

Thus, contractually-delivered water rights are "far different" than a water right acquired by original appropriation, diversion, and application to beneficial use. *Chaffee Ditch Co.*, 150 Colo. at 91, 371 P.2d at 779. Hence, we interpret contractual grants to use a decreed water right narrowly to avoid depriving a decreed rights holder of property that it did not specifically grant for use. *See Upper Gunnison*, 838 P.2d at 855–56; *Merrick*, 621 P.2d at 955.

As noted above, the 1925 Agreements were consequent to a dispute regarding the distribution of Meadow Island's water among Meadow Island, Consolidated Ditches and Beeman. In this regard, the parties contracted for a plainly stated purpose: to restrict the amount and place of use of Meadow Island's diversions under its decreed water rights.[2] The Consolidated/Meadow Island Agreement—and by incorporation the Beeman/Meadow Island Agreement—have a single intent: to limit Meadow Island's diversions to 40 c.f.s. Hence, both 1925 Agreements restrict Meadow Island's use of Priority No. 12 by limiting Meadow Island to diverting only 40 c.f.s. In addition, the 1925 Agreements limit Meadow Island's use of the 40 c.f.s. to land that may be irrigated. Both 1925 Agreements provide, in relevant part:

> [Meadow Island] will not ... claim or directly or indirectly divert ... *water in excess of forty (40) cubic feet per second* ... for any purpose whatsoever ... *nor shall* any of said forty (40) second feet of said decreed priorities so diverted by said [Meadow Island] *be used upon any land except such as may be irrigated* by water diverted at said head-gate ...

(Emphasis added.) The Beeman/Meadow Island Agreement adds a single provision regarding the distribution of Meadow Island's 40 c.f.s.: Meadow Island agreed to deliver to Beeman excess water. No other purpose or intent beyond settling the distribution of Meadow Island's water was stated and the terms of the 1925 Agreements suggest no other purpose or intent.

Further, PSCo's interest in the excess water also lacks several indicia of ownership. For example, Meadow Island clearly retained its ownership of its decreed rights. As noted above, "[i]t is not intended by this agreement that said [Meadow Island] shall, or does it hereby abandon to the stream any of its water or decreed priorities, or any part thereof ...." Thus, the 1925 Agreements enable Meadow Island's continued ownership of its decreed water rights and specify the distribution of that water among Meadow Island, the ditches represented by Consolidated Ditches, and Beeman. In addition, while a decreed right is for a specified amount, *see Trail's End Ranch*, 91 P.3d at 1061, the excess water to which PSCo is entitled varies based on the quantity required for immediate use by Meadow Island. According to Gary Thompson, PSCo's water engineering expert, the amount has never been quantified and PSCo did not seek to have it quantified here. In addition, PSCo's receipt of this water is conditioned on Meadow Island's needs. The delivery of water to Beeman, and thus PSCo, occurs only when Meadow Island does not require it for its immediate use. The Beeman/Meadow Island Agreement does not confer an absolute right to the delivery of a specified amount of water at a specific time.

That the clear intent of the 1925 Agreements was to prevent Meadow Island from diverting water in excess of 40 c.f.s. does not compel the further conclusion urged by PSCo that the 1925 Agreements therefore permit consumers of the contractually-delivered water to seek a change of use for the excess water.[3] Because the intent of the 1925

---

2. As stated in Part I, the 1925 Agreements specify that the contract settles "a dispute ... as to the *amount* of water which [Meadow Island] should be permitted to divert to its head-gate under said decree and the *place of use thereof*" (emphasis added).

3. We note that PSCo seeks to introduce extrinsic evidence, which was introduced at trial regarding a change of use for the 12/90ths water, on the

issue of whether PSCo may change the use of the excess water. PSCo proposes this extrinsic evidence demonstrates that the purpose of the 1925 Agreements was to prevent an expansion of use by limiting Meadow Island's drafts to 40 c.f.s. As made clear by the plain language of the 1925 Agreements themselves, extrinsic evidence is unnecessary to demonstrate this point. Thus, even were we to consider PSCo's proposed evidence

Agreements was to limit Meadow Island's drafts of water, the parties did not bargain regarding the right to seek a change of use for the excess water because the disputed issue resolved by the 1925 Agreements was the *distribution* of Meadow Island's water. Consequently, the 1925 Agreements contain no language regarding a change of use for the excess water because Meadow Island did not intend to grant a change of use.

Accordingly, we decline to interpret the Agreements' silence as a bargain for a change of use of water right, one of the most important sticks in the bundle constituting a water right. A contrary conclusion "would severely undermine the rights and obligations acquired [under Meadow Island's decrees] as a result of water adjudication proceedings." *See Upper Gunnison,* 838 P.2d at 855. Allowing a change of use for the excess water without the consent of Meadow Island would enlarge PSCo's consumer benefits beyond those for which it contracted *see Merrick,* 621 P.2d at 954, and "would require the court to make a new and different contract for the parties, which it cannot do." *Upper Gunnison,* 838 P.2d at 855; *see also Bijou Irrigation Co.,* 926 P.2d at 60.

PSCo nonetheless argues that, in light of Colorado's clear policy of maximization of beneficial use under section 37–92–102(1)(a), C.R.S. (2005), silence in a contract regarding changes to new uses should be construed in favor of allowing use for non-irrigation purposes, provided the change is not contrary to the contractual purposes and there is no expansion of use. On the facts before us, we do not agree.

■ We have previously explained that where, as here, the scope of a water right is defined by contract, the general provisions of Colorado water law may still be applicable, but their application is subject to the terms of the contract. *Bijou Irrigation Co.,* 926 P.2d at 60. For example, in *Merrick,* 621 P.2d at 955–56. we held that contract provisions controlled over provisions of the plan for augmentation statute, section 37–92–305(3), C.R.S. (2005). In *Concerning Appli-*

*cation for Water Rights of Town of Estes Park in Larimer County v. N. Colo. Water Conservancy Dist.,* 677 P.2d 320, 326–27 (Colo.1984), we applied contract terms rather than statutory provisions in denying a plan for augmentation. Finally, in *Perdue v. Fort Lyon Canal Co.,* 184 Colo. 219, 223, 519 P.2d 954, 956 (1974), we held that, regardless of statutory provisions, an appropriator may by contract make its priority inferior to another. Thus, the statutory principle of maximization of beneficial use is inapplicable to the contract before us. Given the plain and narrow scope of the 1925 Agreements, we cannot apply the principle to create a new contract between the parties. *See Bijou Irrigation Co.,* 926 P.2d at 60.

Accordingly, we affirm the water court's holding that PSCo could not change the use of the excess water without the consent of Meadow Island.

## B. Cross–Appeal

■ Meadow Island argues PSCo's plan for augmentation, which allows for out-of-priority surface and well diversions downstream from the original South Platte River head-gate, includes a change in point of diversion prohibited by the Consolidated/Meadow Island Agreement. We conclude the 1925 Agreements do not prohibit PSCo from augmenting out-of-priority diversions with Meadow Island water. Hence, we affirm the water court's approval of PSCo's plan for augmentation.

Concerning diversion points, the 1925 Agreements provide that Meadow Island "will not draw, or cause to be drawn, water ... under its said decreed priorities except at its present head-gate on said river." The parties agreed that this contractual restriction prohibits adjudicated holders of Meadow Island water from changing the point of diversion from the South Platte River head-gate.

■ We construe contractual provisions restricting the rights of an adjudicated right narrowly. An adjudicated right, as noted

on the basis that the contractual silence created ambiguity, PSCo's evidence would not further

illuminate the issue before us.

above, is a highly-guarded property right. Thus, we interpret restrictions narrowly to avoid depriving its holder of rights it did not clearly, or by necessary implication, grant when it agreed to the water use contract.

In *Trail's End Ranch LLC v. Colo. Div. of Water Res.*, 91 P.3d 1058 (Colo.2004), this court considered what constitutes a change in point of diversion. The petitioner, Trail's End, diverted water at its decreed point of diversion, returned it directly to the stream, and "recaptured" and returned the water further downstream where it could be put to beneficial use. *Id.* at 1060. Trail's End did not, however, adjudicate a change of water right, quantify historic consumptive use, or add water to the creek. *Id.*

To determine whether Trail's End was required to adjudicate a change of water right for its proposed practice, we explored the meaning of the terms "diversion" and "natural course." We observed that the term "diversion" has a specific meaning under section 37–92–103(7), C.R.S. (2003), "which includes removing water from its natural course or location by means of a ditch ... or other structure or device." *Id.* at 1061 (quoting § 37–92–103(7)). We further observed that the term "natural course" plainly referred "to the path along which the water flows in nature as distinguished from its path under artificially induced conditions." *Id.*

Applying this understanding of "diversion" and "natural course," we concluded that Trail's End's proposed practice would change or add new or supplemental points of diversion. *Id.* at 1060. We observed:

> [T]here can be no dispute that [Trail's End] proposed to divert water from Spruce Creek at its decreed points of diversion and, *before applying that water to a beneficial use* or placing it into a decreed point of storage, return it by ditches to Spruce Creek, for *subsequent removal downstream.* The proposal would not add to the creek any water that was not already there and would clearly *have no effect on the natural course of the creek.* The water subject to downstream removal would therefore continue to flow along the existing course of Spruce Creek at· the undecreed points proposed for its removal,

whether or not it were briefly detoured at an upstream location by Trail's End. Under these circumstances, *the proposed downstream takings constitute diversions within the contemplation of the statute and cannot benefit from the priorities of existing .water rights without a change of those rights.*

*Id.* at 1062 (emphasis added). Consequently, we concluded Trail's End was required to adjudicate the change in point of diversion. *Id.* at 1063.

■ Here, PSCo proposes to continue diverting water at the South Platte River headgate and to use the 12/90ths water further downstream to augment out-of-priority diversions. Specifically, the 12/90ths water PSCo seeks to change will continue to be diverted at its decreed point of diversion for the Beeman Ditch on the South Platte River. The water will flow through the Beeman Ditch and PSCo's own lateral ditch, but will be put to no beneficial use prior to its return to either the St. Vrain Creek or the South Platte River: Prior to the time the water is returned to the streams, it will be measured to quantify the amount of water available under that right to augment senior rights. The water will then be returned to the stream to augment out-of-priority diversions, which will occur at wells with their own decreed priority dates. Thus, PSCo's plan for augmentation would continue to deliver the 12/90ths water through the Meadow Island head-gate. The 12/90ths water will serve as replacement, or substitute, water to satisfy rights senior to the junior out-of-priority diversions. This court has previously explained that the terms "replacement water" and "substitute water," as used in statutes relating to out-of-priority diversions of water pursuant to an augmentation plan, "refer to the water supplied to decreed water rights holders under an exchange or augmentation plan." *Empire Lodge Homeowners' Ass'n v. Moyer,* 39 P.3d 1139, 1153 (Colo. 2001); *see also* §§ 37–92–103(9); 37–92–305(5); 37–80–120(2)–(4), C.R.S. (2005). Hence, water supplied under an augmentation plan, as here, replaces the water that holders of vested rights would otherwise receive. Under these circumstances, the sub-

stituted water is not "diverted." Rather, it is available for use by holders of vested rights.

Here, PSCo proposes to use the 12/90ths water as the substitute supply to decreed water rights under its augmentation plan. PSCo's plan complies with the contract because it will continue to divert the 12/90ths Meadow Island water at the contractually specified diversion point on the South Platte River. The use of the 12/90ths water, which augments out-of-priority diversions under decreed rights to satisfy vested rights, does not constitute a prohibited diversion under the 1925 Agreements.

Moreover, the contractual provision regarding the point of diversion must be read within the context of the 1925 Agreements as a whole. As we have observed, PSCo seeks to use the 12/90ths water as a source of substitute supply in an augmentation plan. The 1925 Agreements were executed prior to the legislature's statutory recognition of plans for augmentation in the Water Right Determination and Administration Act of 1969 (the "Act"). Consequently, the parties could not have contemplated whether the water could be used to augment subsequent downstream diversions and whether the use of water to augment such diversions would be considered a change in diversion points prohibited by the chosen contract language. At the time the contracts were entered, the legislature had not authorized out-of-priority diversions via a plan for augmentation.

To maximize beneficial use of water, the Act provides a number of mechanisms to increase the supply of available water. These mechanisms include changes of water rights and plans for augmentation. A "change of water right" includes a change in the point of diversion. § 37–92–103(5). In turn, a "plan for augmentation" is "a detailed program ... to increase the supply of water for beneficial use in a diversion or portions thereof by development of *new or alternate means or points of diversion* ...." § 37–92–103(9) (emphasis added). Thus, a plan for augmentation may, but need not, include a change of water right such as a change in point of diversion. *See City of Florence v. Bd. of Waterworks of Pueblo*, 793 P.2d 148, 150 (Colo.1990).

Augmentation plans thus anticipate an increase in the available supply of water. In this regard, the proponent of an augmentation plan may not expand historical use to the injury of other vested rights:

> Augmentation plans implement the Colorado doctrine of optimum beneficial use and priority administration, which favors management of Colorado's water resources to extend its benefit for multiple beneficial purposes. *Out-of-priority diversions* can occur only when a replacement supply of water, suitable in quantity and quality, is made available to substitute *for the otherwise diminished amount of water available to supply other water rights exercising their priorities.*

*Empire Lodge Homeowners' Ass'n,* 39 P.3d at 1150 (emphasis added) (quoting *Williams v. Midway Ranches Prop. Owners Ass'n,* 938 P.2d 515, 522 (Colo.1997)). In short, a water court may not approve an augmentation plan if vested rights will be injured and, thus, an augmentation plan cannot enlarge historic consumptive use.

We reiterate that the 1925 Agreements were effectuated to resolve a dispute regarding the distribution of Meadow Island's water, with the stated intent of limiting Meadow Island's draft to 40 c.f.s. Read in context, then, this limit on the point of diversion correlates to the purpose of preventing an enlargement of Meadow Island's historic consumptive use. However, the injury concerns associated with expanded historical consumptive use are not present here. Meadow Island concedes PSCo has undertaken the necessary water court procedures to quantify and limit augmentation to historical consumptive use to prevent enlargement of the water right. Further, because the lands historically irrigated by PSCo's Beeman shares will no longer be irrigated, the water delivered to the stream as a source of substitute supply will include the historic consumptive use component, in addition to the historic return flow component. This will result in an increase, rather than a deficit, in the amount of water physically delivered by PSCo to the stream.

An approval of an augmentation plan, such as the one here, is therefore consistent with the intent of the 1925 Agreements, which sought to limit Meadow Island water from expanded use. Because contractual restrictions on adjudicated water rights should be construed narrowly, we do not read the 1925 Agreements as prohibiting the augmentation of additional downstream out-of-priority diversion points.

Hence, we decline to restrict PSCo's adjudicated water rights beyond the 1925 Agreements' purpose and intent of preventing an enlarged use. To read the 1925 Agreements as prohibiting augmentation with the 12/90ths water, when the intent of the 1925 Agreements was related to the point of diversion only to the extent a change threatened expansion, extends the contract provision beyond its purposes. Because PSCo proposes to continue diverting water at the original South Platte River head-gate, it complies with the requirement that the point of diversion not be changed and does not violate the purpose of the contract. Therefore, PSCo may operate its augmentation plan without violating the 1925 Agreements. Accordingly, the water court's approval of PSCo's augmentation plan is affirmed.

## IV. Conclusion

The water court's conclusion that PSCo may not change the use of the excess water is affirmed. Its approval of PSCo's plan for augmentation is also affirmed on the basis that the 1925 Agreements do not prohibit the use of PSCo's share of the 12/90ths water to augment the out-of-priority diversions, as decreed by the water court.

Justice COATS concurs in part and dissents in part, and Justice EID joins in the concurrence and dissent.

Justice COATS, concurring in part and dissenting in part.

While I agree that the 1925 agreement between Meadow Island and Beeman regarding so-called "excess water" does not allow for a change of use, I do not believe that the 1925 agreement between Consolidated Ditches and Meadow Island is any less restrictive.

Quite the contrary, unlike the agreement with Beeman, which the majority characterizes as remaining silent with regard to change of use, see maj. op. at 342, the agreement with Consolidated expressly limits both the point at which Meadow Island's senior 40 c.f.s. may be diverted and the use (or at least the place of the use) to which that water may be applied. Whether or not trading water for out-of-priority diversions elsewhere was even a possibility when the agreement was entered into, Meadow Island bargained away, for the acknowledgement of its priority as indisputably senior, its right to draw and use the subject 40 c.f.s. in any manner other than specified in the agreement.

The agreement in question expressly prohibits any of Meadow Island's senior 40 c.f.s. (including Beeman's, and therefore PSCo's, 12/90ths share) from being "used upon any land except such as may be irrigated by water diverted at said head-gate under the ditches of this time constructed and used, and it will not draw, or cause to be drawn, water from said river or its tributaries under its said decreed priorities, except at its present head-gate on said river...." Rather than understanding this language as a limitation to use for irrigation purposes, the water court construed it only to limit usage within a particular area. In addition, it held that PSCo's proposed augmentation plan did not involve additional points of diversion because drawing water again, at its wells further downstream, did not constitute a diversion at all.

Whether a contractual condition that the water not be "used *upon* any land except such as may be irrigated" (emphasis added) can be reasonably construed to permit any use other than irrigation turns out, however, to be of little consequence because the majority permits the water in question to be used outside the designated boundaries altogether. And with regard to the water court's determination that subsequent withdrawal by PSCo at its wells would not even constitute a diversion, which flies in the face of statutory definition and prior case law, see *Trail's End Ranch, LLC v. Colo. Div. of Water Res.*, 91 P.3d 1058, 1061 (Colo.2004) (noting statutory definition of diversion to include removing

water from its natural course or location by means of some structure or device and finding diversion upon "recapture" after previous diversion and return of diverted water unused to the stream), the majority holds only that the augmentation plan does not involve a "prohibited" diversion.[1] See maj. op. at 344. In support it offers several possible rationales for finding that the proposed withdrawal would not be prohibited by the agreement.

Initially, the majority announces that PSCo's plan complies with the contract because it will continue to divert its 12/90ths share of Meadow Island water at the contractually-specified diversion point. Id. at 343–44. But the contract, of course, does not merely require diversion at a particular point; it prohibits withdrawal at any other point. In addition, the majority notes that because the legislature had not yet authorized plans for augmentation at the time of the contract, the parties could not have intended further withdrawal pursuant to such a plan to be considered a change in the point of diversion. Id. at 344. But the contract is, of course, not concerned with a statutory change of water right or a statutorily defined change in the point of diversion; it unequivocally bars Meadow Island from "draw[ing], or caus[ing] to be drawn, water ... except at its present head-gate on said river." Finally, the majority suggests that despite this inconvenient language, the real purpose of the agreement (as evidenced by extrinsic evidence) was merely to prevent "an enlargement of Meadow Island's historic consumptive use." See maj. op. at 344. Whether or not the agreement's reference to a particular usage could be considered ambiguous, permitting consideration of extrinsic evidence on that point, its limitation of withdrawal to a particular headgate and its limitation of whatever usage it permits to particular lands could not be clearer. Such express terms of a contract cannot be ignored, even if there really were other evidence compelling a conclusion that they were not inspired by the central concern of the parties. See Ad Two, Inc. v. City & County of Denver, 9 P.3d 373, 376 (Colo.2000).[2]

Although it does not expressly draw any inference from its own observation, in describing PSCo's augmentation plan, the majority notes that the out-of-priority diversions benefiting from the plan will come from downstream wells, which have their own decreed priority dates. Maj. op. at 343–44. To the extent that it intends therefore that the out-of-priority diversions contemplated by PSCo's augmentation plan not be considered diversions pursuant to Meadow Island's priority no. 12 at all, and not benefit from the priorities of that adjudicated right, the majority offers a more powerful rationale for the augmentation plan's compliance with the restrictions of the agreement on points of withdrawal. Cf. Trail's End, 91 P.3d at 1062 (holding not that "recapture" of previously diverted water, subsequently returned to the stream, was prohibited, but merely that such subsequent diversions could not benefit from the priorities of existing water rights without a change of those existing rights). Clearly,

---

1. The majority also suggests that "replacement" or "substitute" water supplied "under an augmentation plan" is not "diverted." Maj. op. at 343 ("Under these circumstances, the substituted water is not 'diverted.' Rather, it is available for use by holders of vested rights."). Apparently the majority intends only that redelivery of the substitute water to the stream in order to satisfy other vested rights does not constitute a separate diversion. It clearly acknowledges that withdrawal at the Meadow Island/Beeman headgate constitutes a diversion and that withdrawal by PSCo at its downstream wells as anticipated will amount to out-of-priority diversions. And presumably it does not intend that withdrawal by other users for whom the water provides a substitute supply, according to their own priorities, will not constitute diversions.

2. The majority also suggests that it construes the contract narrowly to avoid depriving an adjudicated rights-holder of rights not clearly bargained for under the contract. See maj. op. at 341, 343 (relying on Board of County Comm'rs of the County of Arapahoe v. Upper Gunnison River Water Conservancy Dist., 838 P.2d 840, 855–56 (Colo.1992) and Merrick v. Fort Lyon Canal Co., 621 P.2d 952, 955 (Colo.1981)). Unlike the cases upon which it relies, however, the contract in this case is an agreement between two holders of adjudicated rights, each accepting restrictions on its asserted rights in order to resolve a dispute over their respective priorities. Even if the majority's construction can reasonably be characterized as "narrow," it remains unclear to me why the contract should be construed narrowly to secure the rights of one adjudicated rights holder as opposed to the other.

the agreement only places restrictions on the diversion and use of Meadow Island's senior 40 c.f.s., which are expressly made the subject of the agreement. At the same time, however, this conceptual model tacitly acknowledges that the water ultimately used by PSCo, after diversion at its downstream wells, cannot be considered Meadow Island water.

Instead, under this conceptualization, the 12/90ths share of Meadow Island water owned by PSCo is returned to the stream to satisfy the needs of appropriators with rights senior to PSCo's downstream junior rights, on land other than that irrigated by water diverted at the Meadow Island/Beeman headgate in 1925. The augmentation plan must therefore violate the agreement either by permitting Meadow Island water to be drawn at a point other than the 1925 headgate or by permitting the Meadow Island water to be used upon lands other than those prescribed by the agreement. To treat the water ultimately used by PSCo as coming from one appropriation for purposes of one contractual limitation and another for purposes of a second contractual limitation, whether intended or not, suggests (at least to my mind) a kind of judicial sleight of hand.

Whether the proposed augmentation plan could be said to directly injure other rights or not, permitting PSCo to barter away its 12/90ths share of the Meadow Island 40 c.f.s. to facilitate out-of-priority diversions elsewhere, rather than forgo its use of the water as agreed, is of consequence to other rights on the stream, as the diverse group of opposers demonstrates. While my disagreement with the majority appears to have more to do with contract than with water, the effect of the majority's holding is the same. Notwithstanding its merits as a statutorily permitted augmentation plan, I would not sanction a proposal like this one, which is so clearly prohibited by the express language of a contract, voluntarily entered into by the interested parties. Even though augmentation plans may not have been fully foreseeable at the time the agreement was entered into, if Consolidated Ditches and its members were farsighted enough to negotiate an agreement limiting Meadow Island's seniority to 40

c.f.s., withdrawn at a particular headgate, delivered through particular ditches, and used upon particular lands, they are entitled to the benefit of their bargain.

I therefore concur in part and dissent in part.

I am authorized to state that Justice EID joins in the concurrence and dissent.

