Catherine Boyer LoPRESTI and Peter LoPresti, Applicants–Appellants

and

City of Fountain and Widefield Water and Sanitation District, Opposers–Appellants

v.

John BRANDENBURG; Douglas and Nancy Brandon; Dilley Family Trust; James D. Hood; Ronald Keyston; Arlie Riggs; Schneider Enterprises, Inc.; Dr. Charles Schneider; and Mund Shaikly, Opposers–Appellees

and

Steven J. Witte, Division Engineer, Water Division No. 2, and Dick Wolfe, State Engineer, Appellees Pursuant to C.A.R. 1(e).

No. 10SA191.

Supreme Court of Colorado, En Banc.

Dec. 12, 2011.

Rehearing Denied Jan. 17, 2012.

Carlson, Hámmond & Paddock, LLC, William A. Paddock, Beth Ann J. Parsons, Denver, Colorado, Attorneys for Applicants–Appellants Catherine Boyer LoPresti and Peter LoPresti.

Alperstein & Covell, P.C., Cynthia F. Covell, Andrea L. Benson, Denver, Colorado, Attorneys for Opposer–Appellant City of Fountain.

White & Jankowski, LLP, Sarah A. Klahn, Matthew L. Merrill, Denver, Colorado, Attorneys for Opposer–Appellant Widefield Water & Sanitation District.

W.B. Schroeder Law Office, LLC, Wayne B. Schroeder, Boulder, Colorado, Attorneys for Opposers–Appellees John Brandenburg, Douglas and Nancy Brandon, and James D. Hood.

Justice EID delivered the Opinion of the Court.

This appeal addresses orders of the District Court for Water Division No. 2 regarding the administration of water on Alvarado Creek in Custer County. Applicants–Appellants Catherine Boyer LoPresti and Peter LoPresti ("LoPrestis") and Opposers–Appellants City of Fountain and Widefield Water and Sanitation District ("Fountain & Widefield") claim the water court erred in voiding a rotational no-call agreement titled the "Beardsley Decree." Opposers–Appellees John Brandenburg, Douglas and Nancy Brandon, Dilley Family Trust, James D. Hood, Ronald Keyston, Arlie Riggs, Schneider Enterprises, Inc., Dr. Charles Schneider, and Mund Shaikly (collectively "Brandenburg") argue that the Beardsley Decree was an improperly noticed change in water rights, and as such the water court correctly declared it void.

We now hold that the Beardsley Decree is a valid rotational no-call agreement because, by its plain language, it does not sanction a change in water rights. Accordingly, we reverse the judgment of the water court.

## I.

Alvarado Creek flows east from the Sangre de Cristo Mountains and splits into two distributary channels at a fork. The southern channel is called Alvarado Creek and the northern channel is called the North Fork of Alvarado Creek ("North Fork").[1] The channels upstream and downstream of the fork are collectively known as the "stream system." The North Fork dries up before it can reach any other stream. By contrast, Alvarado Creek flows through tributaries into the Arkansas River. There is no separate source stream that joins either of the channels. The first appropriations of water on the stream system began in the 1870s. By the 1890s, appropriations totaled 46.63 cubic feet per second ("c.f.s."). Despite the cumulative appropriation of 46.63 c.f.s., the maximum flow rate rarely exceeds 12 c.f.s. in the spring, although the flow has allegedly reached 18 c.f.s. at times, and the flow rate declines below 2–3 c.f.s. by late summer. The stream system has always been adjudicated as though it were one stream with a common source of supply.[2] To assist in administering water rights on the

---

1. Certain water rights on Alvarado Creek and the North Fork were decreed with a source of Hiltman Creek (Alvarado Creek above the fork), the North Branch of Hiltman Creek (the North Fork), or the South Branch of Hiltman Creek (Alvarado Creek below the fork). Since all the water rights were adjudicated on March 12, 1896, it is unclear why the water court used different names to describe these streams.

2. In 1896, ditches above and below the now existing control structure (defined herein) were adjudicated as having a single source of supply. To illustrate this fact, one can compare the sources of supply for ditches both upstream of the fork and on each channel downstream of the fork. For instance, the Frederick Jeske No. 1 Ditch is located on the North Fork downstream of the control structure; its source is listed as Hiltman Creek. The Hiltman & Falkenberg No. 2 is located on Alvarado Creek upstream of the Control Structure; its source is also listed as Hiltman Creek. The Moritz Brandenburg No. 5 is located on Alvarado Creek downstream of the control structure; its source is listed as the South Branch of Hiltman Creek. All three of these rights were adjudicated on March 12, 1896.

stream system, the State's Water Division engineer installed, in 1999, a control structure at the fork where Alvarado Creek and the North Fork split. Each channel on the stream system downstream of the control structure is supplied with water from Alvarado Creek.

Four water rights along the stream system are at issue in this appeal: W.A. Bell No. 1 ("Bell No. 1"), Legard No. 5, Legard No. 11, and Legard No. 12 (Bell No. 1, Legard Nos. 5, 11, and 12, collectively the "Four Ditches"). These four water rights were adjudicated on March 12, 1896, in what was formerly known as Water District No. 13. All four water rights are located downstream of the control structure. For each decreed water right at issue, the source's name and the claimant's name have changed since the 1896 adjudication as described by Table 1.[3]

In 1908, George Beardsley (then owner of the Legard Nos. 5, 11, and 12), sued Allen Bates (then owner of the Bell No. 1), the Water Commissioner, and others to resolve a dispute over the use of his water rights. Beardsley alleged that Alvarado Creek and the North Fork were distinct stream systems.[4] Bates denied this allegation, arguing that Alvarado Creek and the North Fork are one and the same streams and, therefore, the water rights on both streams should be ad-

ministered in priority against each other as adjudicated in 1896. Prior to trial, the parties to the litigation offered a settlement agreement into evidence. The court reviewed the proposed settlement and entered a decree (the "Beardsley Decree" or "Decree") on December 16, 1908, which stated in relevant part:

> [T]he rotation of use in point of time of the waters of said streams, as decreed to the [Four] ditches ... is [ ] lawful .... [A]ll of the waters naturally flowing in said creeks ... to the extent that the same have been decreed in and by the decree of the District Court ... to the [Four] ditches, severally and respectively, shall ... be treated as waters of one stream; [the water] shall be ... rotated as follows: Beardsley shall have, as against [Bates], the right to the use of all of said waters, and he shall have the right to divert the same, and all thereof, from said streams, and any and all of them, and flow and conduct the same to such a point, or points, of use as he may desire the same for his lawful uses [and Bates shall have the same rights for alternating four day periods]....

The Beardsley Decree prevented litigation over water rights decreed to the Four Ditches for almost eighty-eight years. But long-

3.

| Ditch | 1908 Owner | 2011 Owner(s) | Stream's Decreed Name in 1896 | Modern Name | Flow Rate | Appropriation Date |
|---|---|---|---|---|---|---|
| W.A. Bell No. 1 | Bates | Fountain & Widefield | Neave Creek or Cheese Factory Creek | Alvarado Creek | 3.71 c.f.s. | 8/31/1871 |
| Legard No. 5 | Beardsley | LoPrestis | Neave Creek or Cheese Factory Creek | Alvarado Creek | 3.94 c.f.s. | 5/1/1873 |
| Legard No. 11 | Beardsley | LoPrestis | Legard Creek | North Fork of Alvarado Creek | 4.50 c.f.s. | 5/31/1872 |
| Legard No. 12 | Beardsley | LoPrestis | Legard Creek | North Fork of Alvarado Creek | 4.84 c.f.s. | 12/1/1873 |

*Table 1*

4. Beardsley alleged that the North Fork was a naturally occurring stream, separate and distinct from Alvarado Creek. Beardsley's predecessor in interest allegedly built an artificial channel between the two streams at the fork. This alleged channel would have made an additional volume of water available at the Legard No. 5 because it caused an unnatural volume of water to flow in Alvarado Creek downstream of the fork.

running disputes between water rights owners on the over-appropriated stream system finally spawned this litigation.

This appeal involves two water court cases. First, in Case No.1996CW228, the LoPrestis filed an application for a change of several water rights on the stream system including the Legard Nos. 5, 11, and 12. Several parties opposed the LoPrestis' application. On August 3, 2000, John Brandenburg filed a motion for partial summary judgment seeking to void the Beardsley Decree by arguing it was an improperly noticed change in water rights.[5]

On October 12, 2000, the water court granted the motion for partial summary judgment in a written order that declared the Beardsley Decree void ("2000 Order"). The 2000 Order found that the Beardsley Decree "constitutes judicial sanction of Beardsley and Bates switching water back and forth between streams to meet their own needs, with the consequent changes in points of diversion from those specified in their respective decrees. This was not in accord with [applicable law because] the notice provision of the then controlling statute [relating to a change in water rights] was not fulfilled."

The second case, 1999CW77, filed by John Brandenburg, Arlie Riggs, Frank Dilley, and Ronald Keyston[6] against the State of Colorado ("State"), Division Engineers, the Water Commissioner, the LoPrestis, and others, sought to enjoin the control structure from being installed where Alvarado Creek splits at the fork on John Brandenburg's property. In his complaint, Brandenburg alleged (as Beardsley did in 1908) that an artificial channel had been constructed to connect Alvarado Creek and the North Fork.

Based on this allegation, Brandenburg argued that water rights holders on Alvarado Creek downstream of the control structure should not be able to call for the delivery of water that would naturally have flowed into the North Fork. Brandenburg took this position even though the 1896 adjudication of water rights on the stream system decreed priorities under the assumption that Alvarado Creek and the North Fork shared a common source of supply. Brandenburg lost at the injunction hearing, and the water court granted the State's request for a mandatory injunction to install the control structure on his property.

Because 1996CW228 and 1999CW77 shared some common issues, the water court consolidated those issues in one trial to the court on March 14–15, 2001. After trial, the water court took the case on advisement. By an order dated December 5, 2001 ("2001 Order"), the water court determined that Alvarado Creek and the North Fork have a common source of supply based on the evidence presented at trial.[7] Water rights on the North Fork therefore could be "curtail[ed]" to supply senior water rights on Alvarado Creek downstream of the control structure. In addition, the 2001 Order reaffirmed the 2000 Order's conclusion that the Beardsley Decree is void for improper notice. Case 1999CW77 was closed after the 2001 order was entered.

The 2001 Order, however, did not resolve the LoPrestis' 1996 application for change of water rights, so Brandenburg moved for summary judgment to dismiss the LoPrestis' application. The water court denied Brandenburg's motion for summary judgment on October 15, 2003.[8] After October 15, 2003, no filings were made in either 1996CW228 or 1999CW77 until March 1, 2010, except for one substitution of counsel form filed by the

---

5. In 1908, like today, any change in water rights had to satisfy certain notice requirements. *See* § 72–3227, C.R.S. (1908).

6. Even though the parties who filed 1999CW77 are not identical to the Opposers–Appellees in this appeal, both will be referred to as "Brandenburg" in this opinion because their positions with respect to the Beardsley Decree are identical.

7. The water court found, despite Brandenburg's allegation in 1999 and Beardsley's allegation in 1908, no "physical or other credible evidence to support the proposition that there is now or ever was an artificial channel connecting two independent streams."

8. The water court denied Brandenburg's motion regarding the LoPrestis' application to change the legal description for the lands irrigated by the Legard Nos. 8, 9, 11, 12, and 13.

State Engineer and the Division Engineer on July 26, 2005.[9]

Brandenburg resurrected 1996CW228 on March 1, 2010, when he filed a Motion to Dismiss for Failure to Prosecute and for Entry of Rule 54(b) Certification. *See* C.R.C.P. 54(b) (permitting entry of final judgment on fewer than all pending claims). On April 30, 2010, the water court denied Brandenburg's motion to dismiss for failure to prosecute, but granted his motion for Rule 54(b) certification to permit immediate appeal of the issue involving the validity of the Beardsley Decree.[10] We now hold that the Beardsley Decree is a valid rotational no-call agreement because, by its plain language, it does not sanction a change in water rights. Accordingly, we reverse the judgment of the water court.

## II.

■ Before addressing the merits, we consider whether 54(b) certification was appropriate in this case given that the orders certified were entered over eight years prior to certification.

The water court certified the 2000 Order and the 2001 Order pursuant to Rule 54(b) on April 30, 2010. There was no objection made below to the timeliness of Brandenburg's 54(b) motion, and no party raises the timeliness issue before us. However, we find

it initially troubling that a trial court certified, as final under 54(b), orders it entered over eight years before. Thus, we raise the timeliness issue on our own.

On its face, Rule 54(b) does not contain a time limitation for filing a motion seeking certification. Courts have taken different approaches to the timeliness issue. For example, in interpreting the federal counterpart to our 54(b),[11] the Seventh Circuit has held that a motion for certification should generally be filed within thirty days of the entry of the order[12]:

> [A]s a general rule it is an abuse of discretion for a district judge to grant a motion for a [Fed.R.Civ.P.] Rule 54(b) order *when the motion is filed more than thirty days after the entry of the adjudication to which it relates.* There may be of course cases of extreme hardship where dilatoriness is not occasioned by neglect or carelessness in which the application of this general rule might be abrogated in the interest of justice. *Those occasions ought, however, to be extremely rare.*

*Schaefer v. First Nat'l Bank,* 465 F.2d 234, 236 (7th Cir.1972) (emphasis added).[13] Other courts have applied a more lenient version of the abuse of discretion standard, considering timeliness on a case-by-case basis. *See, e.g., Noland v. Va. Ins. Reciprocal,* 224 W.Va. 372, 686 S.E.2d 23, 28 n. 16 (2009) (listing cases). We need not decide here which ap-

9. A third case, 2008CW47, was filed by Fountain & Widefield, who purchased an interest in Bell No. 1. Fountain & Widefield seek to quantify the historic consumptive use associated with the Bell No. 1 and to change the Bell No. 1's type of use from irrigation to municipal purposes. Brandenburg is an opposer in 2008CW47 as well, arguing that the water rights at issue, including the Bell No. 1, have been the subject of a previous application that resulted in a decision declaring the Beardsley Decree void. The LoPrestis have responded by claiming the Beardsley Decree is valid, and that the water court erred in its 2000 Order. The water court stayed 2008CW47 pending the outcome of this appeal.

10. As relevant here, the water court certified the 2000 Order and the 2001 Order.

11. Federal Rule 54(b) is virtually identical to C.R.C.P. 54(b). We therefore find caselaw interpreting the federal rule to be instructive. *See Todd v. Bear Valley Vill. Apartments,* 980 P.2d 973, 978 (Colo.1999).

12. The *Schaefer* court used as a benchmark Fed. R.App.P. 4(a)'s time limit of thirty days to file a notice of appeal. 465 F.2d at 236.

13. One federal district court in the Seventh Circuit has impliedly questioned the continuing validity of *Schaefer. See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC,* No. 04-CV-00346, 2010 WL 4115427, at *5 (N.D.Ill. Oct. 18, 2010) (noting that *Schaefer* was decided "several decades ago" and that "the parties have not cited—nor has the Court's research uncovered—any Federal Circuit decisions adopting or following the Seventh Circuit's general rule providing for a 30-day time deadline for motions for Rule 54(b) certification"). But prior to *Wm. Wrigley,* Seventh Circuit panels have cited *Schaefer* as grounds for dismissing Rule 54(b) appeals as untimely. *E.g., U.S. Gen., Inc. v. Albert,* 792 F.2d 678, 680 (7th Cir.1986).

proach we would adopt, however, because we find that the motion in this instance is the "extremely rare" case that meets the more restrictive standard adopted by the Seventh Circuit.

Here, the substantial delay between the entry of the orders and the filing of the Rule 54(b) motion was occasioned entirely by the LoPrestis' lack of pursuit of the case. It was only after years had elapsed with no activity in the case that Brandenburg filed a motion to dismiss for failure to prosecute, or, in the alternative, for Rule 54(b) certification. Indeed, Brandenburg had no reason to file a 54(b) motion given that he had prevailed in the orders; it appears that he filed it merely as a way of moving the case along.[14] Additional considerations include the fact that this litigation has been pending for fifteen years, and the fact that the validity of the Beardsley Decree impacts at least one other case pending in the water court. Given the unique circumstances presented here, we find that substantial delay between the entry of the orders and the Rule 54(b) motion in this case does not prevent certification.

## III.

We now turn to the substantive issue presented in this case: whether the water court properly declared the Beardsley Decree void. We find that the water court

erred, and hold that the Beardsley Decree is a valid rotational no-call agreement because, based on its plain language, it does not sanction a change in water rights.[15]

### A.

We review the water court's legal conclusions on summary judgment de novo. *City of Englewood v. Burlington Ditch, Reservoir & Land Co.*, 235 P.3d 1061, 1066 (Colo. 2010). We also review de novo the water court's interpretation of a contract. *Lake Durango Water Co. v. Pub. Utils. Comm'n*, 67 P.3d 12, 20 (Colo.2003).

Brandenburg first argues that the water court correctly found the Beardsley Decree to be an illegal change of water rights based on its plain language.[16] The decree provides in relevant part:

[T]he rotation of use in point of time of the waters of said streams, as decreed to the [Four] ditches ... is [ ] lawful.... [A]ll of the waters naturally flowing in said creeks ... *to the extent that the same have been decreed* in and by the decree of the District Court ... to the [Four] ditches, *severally and respectively*, shall ... be treated as waters of one stream; [the water] shall be ... rotated as follows: Beardsley shall have, as against [Bates], the right to the use of *all of said waters*, and he shall have the right to divert the same, and all there-

---

**14.** The water court denied the motion to dismiss for failure to prosecute, and the propriety of that ruling is not before us.

**15.** As a preliminary matter, Brandenburg contends that our scope of review is limited to considering the evidence and arguments before the water court on October 12, 2000, when it first declared the Beardsley Decree void. Brandenburg asserts that we should disregard all arguments and conclusions offered by the LoPrestis and Fountain & Widefield that rely upon record entries, including the water court's orders, dated after October 12, 2000. We decline to address these arguments because we conclude as a matter of law that, by its plain language, the Beardsley Decree creates a valid rotational no-call agreement.

**16.** While litigating this case, both parties have expended great energy arguing about whether the stream system is one stream or two independent streams with different sources of supply. We need not address these arguments for several

reasons. First, the 1896 adjudication assigned all priorities on the stream system against each other. This implicitly assumed that the stream system is one distributary stream with multiple branches; that all decreed points of diversion share a common source of supply; and, consequently, that water right holders can lawfully contract to rotate the call for water between decreed points of diversion on the stream system. Second, the one-stream versus two-stream issue has been repeatedly raised since 1908. In each instance, other than the 2000 Order which we reverse today, the water court specifically determined that the issue is "immaterial" or that there is only one stream system. We are not inclined to disturb these factual findings made years ago. Third, the water court's 2000 Order made no explicit factual finding on the number of streams. Finally, at oral argument, Brandenburg's counsel conceded that the one-stream versus two-stream issue was not pertinent to the outcome of this case. Rather, Brandenburg's counsel argued the case turned on our interpretation of the Beardsley Decree.

of, from said streams, and any and all of them, and flow and conduct the same *to such a point, or points,* of use as he may desire *the same for his lawful uses* [and Bates shall have the same rights for alternating four day periods]....

(Emphasis added). Brandenburg interprets the Decree to mean that the LoPrestis were permitted to divert and use "all of said waters" at any "point or points" as they desire when the call rotates to them. We disagree.

The phrase "all of said waters" should not be read in isolation, as Brandenburg proposes, but rather in the context of the whole Decree. Indeed, the phrase is previously defined in the Decree as: "all of the waters naturally flowing in said creeks ... to the extent that the same have been decreed in and by the decree of the District Court ... to the [Four] [D]itches...." Based on the definition, the phrase "all of said waters" means only those waters decreed to the Four Ditches. As further support for this interpretation, the Decree permits diversion only "to the extent that" the water flowing in the stream system has been decreed to the Four Ditches "severally and respectively."

The Decree's terms therefore do not permit the LoPrestis to divert all of the available water in the stream system down Alvarado Creek or the North Fork to "any point or points." Instead, under the Decree, the LoPrestis can only call for a diversion down Alvarado Creek or the North Fork to deliver water to satisfy their ditches in priority. This call is limited to the maximum amount decreed, "severally and respectively," to each individual ditch pursuant to the 1896 adjudication.[17] Because the Legard No. 5 is on a different channel than the Legard Nos. 11 and 12, the "point or points" language enabled the LoPrestis to choose which ditch or ditches to serve when the stream system's flow was inadequate to fully supply all of the ditches in priority. Thus, the water court erred by concluding that the Decree "constitutes judicial sanction of Beardsley and

Bates switching water back and forth between streams to meet their own needs, with the consequent changes in points of diversion from those specified in their respective decrees."

■ Brandenburg next argues that, even if the Beardsley Decree does not sanction an illegal change of water rights, it still fails as an improper water loan violative of section 37–83–105(1), C.R.S. (2011), which provides that:

> the owner of a water right decreed and used solely for agricultural irrigation purposes may loan all or a portion of the water right to another owner of a decreed water right on the same stream system and that is used solely for agricultural irrigation purposes for no more than one hundred eighty days during any one calendar year [subject to certain limitations]....

To bolster his position, Brandenburg draws an analogy between the present case and *Fort Lyon Canal Co. v. Chew,* 33 Colo. 392, 81 P. 37 (1905). The analogy, however, is inapposite.

*Fort Lyon* involved an agreement under which senior water rights owners with no present need for water loaned their senior water rights to junior water rights holders. 33 Colo. at 403–04, 81 P. at 40. This allowed junior water rights holders to bypass other more senior water rights holders on the same stream system. 33 Colo. at 405, 81 P. at 41. Such a loan is unlawful, without proper notice and approval, because it skirts the priority system and may injuriously affect other water rights. § 37–83–105(1); *Fort Lyon,* 33 Colo. at 405, 81 P. at 41.

The rationale behind *Fort Lyon* and § 37–83–105(1) does not apply here. As previously discussed, the Decree is a settlement agreement that rotates the ability to *call for water* between senior rights holders on a heavily

---

**17.** Since the water court determined Alvarado Creek and the North Fork share one source of supply, and all of the water rights on both channels downstream of the fork were adjudicated against each other in 1896, the 1896 adjudication built in a condition that the flow rate on each of the stream system's channels must be adjusted to satisfy the ditches in priority at a particular time. Of course, the location of ditches in priority changes depending on the need for water and the volume of water flowing above the fork.

over-appropriated stream system.[18] This arrangement allows the available water supply to be shared between those water rights holders in priority, and often enables delivery at a higher flow rate to those who are receiving water at the time. It neither *changes* a junior right holder's priority on the stream system, nor does it *permit* diversion of more water than is decreed to a point of diversion. The Decree also does not permit the use of diverted water on un-decreed land. Rather, the Decree's language is in line with our decisions that "have repeatedly affirmed the ability of a holder of a senior right to enter into a no-call agreement with the holder of a junior right." *City of Englewood*, 235 P.3d at 1066 (citing cases).

Brandenburg does not dispute the validity of no-call agreements under *City of Englewood*. But he asserts that the Decree is unlike the agreement found valid in *City of Englewood* because, in this case, there was no bargained for exchange between the original parties to the Decree. This argument fails, in part, because "any benefit to a promisor or any detriment to a promisee at the time of the contract—no matter how slight— constitutes adequate consideration." *Lucht's Concrete Pumping, Inc. v. Horner*, 255 P.3d 1058, 1061 (Colo.2011). "Consideration may take the form of forbearance by one party to refrain from doing something that it is legally entitled to do." *Id.* Almost any form of consideration will support a valid contract, *see id.*, and except in extreme circumstances, we do not inquire into the adequacy of consideration, *id.*

In this case, Bates, the owner of the Bell No. 1 in 1908, was entitled to call for water (as necessary) at a certain flow rate because he held first priority on the stream system. In the Decree, Bates agreed to forbear his right to call for water against the Legard Nos. 5, 11, and 12 on a rotating basis in exchange for settlement of litigation. Similarly, Beardsley gave up his claims against Bates, which, in all likelihood, would have injured Bates' water rights at the Bell No. 1 if proven. So, contrary to Brandenburg's

urging, the Decree was formed with adequate consideration.

Finally, Brandenburg argues that the Decree has been administered as a change-in-water-rights decree, and thus we should affirm the water court's 2000 Order which found the Decree void for lack of notice because it acted as "a de facto change in points of diversion." According to Brandenburg, parties who act contrary to the plain meaning of a rotational no-call agreement such as the Decree, either intentionally or under a misunderstanding of the agreement's terms, can void, ab initio, an otherwise valid agreement. Again, we are not persuaded.

 Contractual water rights are "far different" from water rights acquired by decree. *Pub. Serv. Co. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 341 (Colo.2006) (hereinafter *"Public Service"*). "A decreed water right is valuable property, not a mere revocable privilege." *Id.* While parties to a contract may obtain certain water rights, only the owner of a decreed right can obtain a change in water rights. *Id.* at 340 (citing *Bd. of Cnty. Comm'rs v. Upper Gunnison River Water Conservancy Dist.*, 838 P.2d 840, 855 (Colo.1992)). Contracting away the ability to apply for a change in water rights can only be done expressly. *Public Service*, 132 P.3d at 341.

For instance, in *Public Service*, the parties settled litigation over water rights via a written agreement. *Id.* at 342. We declined to interpret the settlement agreement as a bargain to change the use of a water right because it was silent on the parties' intent to change the use of water. *Id.* In this case, the settlement agreement (i.e. the Decree) is similarly silent about the parties' intention to change decreed water rights. As such, we apply the rationale of *Public Service* and decline to "make a new and different contract for the parties" by deciding that the Decree is a change decree because it was allegedly administered as a change decree. *Id.* (citing *Upper Gunnison*, 838 P.2d at 855). There-

---

**18.** The relevant order of priority is as follows: Bell No. 1, Legard No. 11, Legard No. 5, Legard No. 6, Legard No.7, Legard No.9, and Legard No. 12. It is possible that the Legard Nos. 6, 7,

and 9 could call for water to the exclusion of the Legard No. 12 even though the call has rotated to the Legard Nos. 5, 11, and 12 under the Decree.

fore, the water court erred by holding the "Beardsley Court is plainly approving a de facto change in points of diversion." [19] Our analysis of the Decree demonstrates that it did not sanction a change in water rights or direct the Division Engineer to administer water rights contrary to the original adjudication.[20]

## B.

After advancing his substantive arguments in support of the water court's 2000 Order, Brandenburg requested attorneys' fees under C.A.R. 39.5 and section 13–17–102(4), C.R.S. (2011), claiming the LoPrestis and Fountain & Widefield overstated the scope of review in their briefs and this appeal lacked substantial justification. We find no merit to these arguments for the reasons stated herein and reject Brandenburg's request for attorneys' fees.

## IV.

For the foregoing reasons, we reverse the water court's 2000 Order that found the Beardsley Decree void. We hold that the Beardsley Decree is a valid rotational no-call agreement because, based on its plain language, it does not sanction a change in water rights.

---

19. Similarly, under the Decree, the decreed flow for the Legard Nos. 11 and 12 cannot legally be diverted at the Legard No. 5. The water court erred in the 2000 Order by finding:

> The plain and unambiguous effect of the "Beardsley Decree" is to lend judicial approval to what at the time was clearly: 1. Diversion of waters under rights relating to a particular stream, with said rights further relating to particular identified lands to be irrigated. 2. To another stream entirely, to be used to irrigate lands not at all associated with the decreed rights. 3. And vice versa.

It may be true that the parties irrigated land with water not decreed to a particular ditch. But the parties' conduct caused by a misunderstanding, unintentionally or otherwise, of the Decree's terms does not change the validity of the Decree.

20. Moreover, when a settlement agreement entered by a court with jurisdiction is valid on its face, the fact that the parties do not act in accordance with its terms afterward, either intentionally or under a misunderstanding about what the contract means, does not make it void. Thus, even if, as Brandenburg claims, the LoPrestis improperly diverted water "under" the Beardsley Decree at the Legard No. 5, that action would not void the Decree.